In the

# United States Court of Appeals

## For the Seventh Circuit

No. 05-1823

IRMA ALEXANDER, Special
Administrator of the Estate of
CHRISTEN CRUTCHER, deceased,

*Plaintiff-Appellant*,

*v.*

MOUNT SINAI HOSPITAL MEDICAL
CENTER, SINAI HEALTH SYSTEM,
d/b/a MOUNT SINAI HOSPITAL
MEDICAL CENTER OF CHICAGO,
SINAI MEDICAL GROUP, et al.,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 2907—**Charles P. Kocoras,** *Judge*.

ARGUED MARCH 31, 2006—DECIDED APRIL 24, 2007

Before ROVNER, EVANS and SYKES, *Circuit Judges*.

ROVNER, *Circuit Judge*. Irma Alexander ("Alexander") is
the daughter of Christen Crutcher, a woman who died
while receiving medical treatment at Mount Sinai Hospi-
tal. As administrator of her mother's estate, Alexander
brought a malpractice action in the Circuit Court of Cook
County against the corporate entities and individual
physicians involved in her mother's care. The United

States removed this malpractice case to federal court because one of the defendants, Dr. Godwin Onyema ("Dr. Onyema"), was deemed to be a federal employee under the Public Health Service Act ("PHSA"), as amended by the Federally Supported Health Centers Assistance Act of 1995 ("FSHCAA"), 42 U.S.C. § 233. A trial resulted in judgment in favor of all of the defendants. On appeal, Alexander challenges subject matter jurisdiction, arguing that Dr. Onyema could not be deemed a federal employee because he did not personally contract with a federally funded health center. Alexander also challenges the district court's directed verdict in favor of one of the defendants as well as several rulings the district court made in the course of the trial. We affirm.

## I.

We begin with the question of subject matter jurisdiction, which we review *de novo*. *Samirah v. O'Connell*, 335 F.3d 545, 548 (7th Cir. 2003). We also review *de novo* a district court's decisions regarding the propriety of removal. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 510 (7th Cir. 2006). The Federal Employees Liability Reform and Tort Compensation Act of 1988, commonly known as the Westfall Act, accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties. *See* 28 U.S.C. § 2679(b)(1); *Osborn v. Haley*, 127 S. Ct. 881, 887 (2007). When a federal employee is sued, the Westfall Act empowers the Attorney General to certify, if appropriate, that the employee was acting within the scope of his or her employment at the time of the incident in question. 28 U.S.C. § 2679(d)(1), (2). If the Attorney General issues such a certification, the employee is dismissed from the action and the United States is substituted as the defendant in place of the employee. 28 U.S.C. § 2679(d)(1).

Thereafter, the lawsuit is governed by the Federal Tort Claims Act ("FTCA"). 28 U.S.C. § 2671 *et seq*. If the action was filed in state court, the case must be removed to federal court. 28 U.S.C. § 2679(d)(2). The "certification of the Attorney General shall conclusively establish scope of office or employment for purposes of removal." *Id.*

Although Dr. Onyema was not a federal employee, he was working at Sinai Family Health Centers ("Sinai"), a federally supported health care center, at the time of the incident at issue here. Dr. Onyema had formed an "Illinois Medical Service Corporation" called Onyema Medical Service, Ltd.[1] He was the sole shareholder and sole employee of this entity. Onyema Medical Service entered into an agreement with Sinai under which Dr. Onyema was to supply medical services to Sinai's various community health centers. Dr. Onyema signed the contract in his own name on a line labeled "Onyema Medical Service, Ltd." The FSHCAA, like the Westfall Act, allows the government to remove from state court a medical malpractice action filed against a physician who is "deemed" to be a federal employee. *See* 42 U.S.C. § 233. A physician who is employed by or is a contractor for a federally funded health center may be deemed by the government to be an employee of the Public Health Service[2] if a number of conditions are met. *See* 42 U.S.C. § 233(h). Once a physi-

---

[1] In Illinois, a physician may incorporate his or her practice under the Medical Corporation Act. 805 ILCS 15/1, *et seq*. The "Act does not alter any law applicable to the relationship between a physician furnishing medical service and a person receiving such service, including liability arising out of such service." 805 ILCS 15/14.

[2] The Public Health Service generally consists of the Office of the Surgeon General, the National Institutes of Health, the Bureau of Medical Services, the Bureau of State Services and the Agency for Healthcare Research and Quality. *See* 42 U.S.C. § 203.

cian has been deemed to be a federal employee acting within the scope of his or her employment duties, the United States is substituted as the defendant and the FTCA provides the exclusive remedy for the physician's negligence. *See* 42 U.S.C. § 233(c), (g). Moreover, once the Secretary[3] deems a physician to be an employee of the Public Health Service, "the determination shall be final and binding upon the Secretary and the Attorney General and other parties to any civil action or proceeding." 42 U.S.C. § 233(g)(1)(F).

Alexander brought this malpractice action in the Circuit Court of Cook County. Pursuant to 28 U.S.C. § 2679(d)(2) and 42 U.S.C. § 233(c), the United States removed the action to federal court after it determined that Dr. Onyema was a contract employee working in the scope of his employment with a federally-funded health center.[4] *See also* 42 U.S.C. § 233(g)-(n). Specifically, the Attorney General's delegate certified that Sinai Family Health Center was a private entity receiving grant money from the Public Health Service pursuant to 42 U.S.C. § 233. R. 1. The delegate also certified that Sinai Family Health Center's "contract employee, GODWIN ONYEMA, M.D., was acting within the scope of his employment at the time of the incidents and is deemed to be an employee of the United States for Federal Tort Claims Act purposes only pursuant to 42 U.S.C. § 233." R. 1. The United States thus removed the case to federal court and moved to substitute itself for Dr. Onyema as the defendant. *See* 28 U.S.C. § 2679(d)(2); 42 U.S.C. § 233(c), (g)-(n).

---

[3] All references to the "Secretary" are to the Secretary of Health and Human Services. *See* 42 U.S.C. § 201(c). All references to the "Attorney General" are to the United States Attorney General or his designee.

[4] No one disputes that Sinai was a qualifying federally funded health center at the time of these events.

Thereafter, the United States moved to dismiss the case because the plaintiff had failed to exhaust her administrative remedies as required by the FTCA. 28 U.S.C. § 2675(a). The district court granted the motion. Alexander moved to reconsider, arguing that the government had incorrectly deemed Dr. Onyema to be a federal employee because Onyema Medical Service rather than Dr. Onyema individually contracted with Sinai. According to Alexander, the government could not treat Dr. Onyema and Onyema Medical Service as identical without making a case for piercing the corporate veil under Illinois law. The government responded that federal tort law rather than Illinois corporate law controlled the result and that the government was entitled to deem Dr. Onyema, the sole employee and sole shareholder of Onyema Medical Service, a federal employee. Citing *Dedrick v. Youngblood*, 200 F.3d 744 (11th Cir. 2000), the district court allowed Alexander to take discovery on the issue of whether Dr. Onyema could be deemed a federal employee in light of the contract with Onyema Medical Service. Following discovery, the district court found that Onyema Medical Service "essentially acted as Dr. Onyema's alter ego with respect to his professional services relationship with Sinai." *Alexander v. Mount Sinai Hosp. Med. Ctr. of Chicago*, 165 F.Supp.2d 768, 772 (N.D. Ill. 2001). The court found that the issue of whether a physician is a federal employee under the FTCA is determined by federal, not state, law. Refusing to elevate form over substance in characterizing the relationship between Dr. Onyema and Sinai, the district court concluded that Dr. Onyema was effectively an employee of a public health center and thus a deemed employee of the federal government. The court therefore dismissed Dr. Onyema from the action and substituted the United States as the defendant.

After Alexander exhausted her administrative remedies, she returned to the district court to pursue her remedies

under the FTCA. Shortly thereafter, she learned that in another case filed against Dr. Onyema by another party, the government admitted that its decision to deem Dr. Onyema a federal employee in Alexander's case had been mistaken. *See Buckley v. Mount Sinai Hosp. Med. Ctr.*, 2002 WL 554524 (N.D. Ill. April 12, 2002). Specifically, the government admitted in the *Buckley* case that because Dr. Onyema had not contracted directly with Sinai, he was not entitled to coverage under the FSHCAA. The court in *Buckley* remanded the action to the state court on the basis of the government's representation that Dr. Onyema was not a federal employee. Citing *Buckley*, Alexander moved for reconsideration of the court's earlier decision dismissing Dr. Onyema and substituting the United States as a defendant. The government opposed the motion, taking the position that, although it made a mistake in Alexander's case, all of the parties were bound by the government's original certification and deeming decision under section 233(g)(1)(F). That section provides:

> Once the Secretary makes a determination that an entity or an officer, governing board member, employee, or contractor of an entity is deemed to be an employee of the Public Health Service for purposes of this section, the determination shall be final and binding upon the Secretary and the Attorney General and other parties to any civil action or proceeding. Except as provided in subsection (i) of this section, the Secretary and the Attorney General may not determine that the provision of services which are the subject of such a determination are not covered under this section.

42 U.S.C. § 233(g)(1)(F). The court denied the motion for reconsideration, agreeing that section 233(g)(1)(F) bound the parties to the government's initial determination that Dr. Onyema was a deemed federal employee. The court

also noted that under section 233(g), review of the government's decision to deem Dr. Onyema a federal employee was extremely limited. Finally, the court noted that it had rested its decision not only on the representations of the government but also on its independent conclusion that Dr. Onyema himself (and not the professional corporation for which he signed) was the contracting party.

Since that time, yet another malpractice action filed against Dr. Onyema made its way to federal court in the Northern District of Illinois. *See ISMIE Mut. Life Ins. Co. v. U.S. Dept. of Health and Human Servs.*, 413 F.Supp.2d 954 (N.D. Ill. 2006). In that case, after the Secretary refused to deem Dr. Onyema a federal employee, the doctor's malpractice insurer sued the U.S. Department of Health and Human Services ("HHS") seeking to overturn that decision. The district court in the *ISMIE* case framed the issue as whether Dr. Onyema is excluded from coverage under the FTCA and the FSHCAA because he contracted with a federally-funded clinic through his eponymous professional corporation rather than as an individual. 413 F.Supp.2d at 955. The *ISMIE* action grew out of a malpractice case filed in state court against Dr. Onyema and the clinic where the plaintiff was treated. The government determined that the clinic was an entity covered under FSHCAA but that Dr. Onyema was not. The government removed the case to federal court based on the clinic's status as a covered entity. As in Alexander's case, the government then moved to dismiss the case against the clinic for failure to exhaust administrative remedies. The district court obliged and returned the remaining claims to state court. As the malpractice case proceeded in state court with Dr. Onyema's malpractice insurer providing his defense, the insurer sought a declaration in federal court that Dr. Onyema is a covered contractor under FSHCAA and that HHS was responsible for Dr. Onyema's defense. *ISMIE*, 413 F.Supp.2d at 957-58.

The district court ruled that HHS was judicially estopped from asserting that Dr. Onyema was not covered under FSHCAA because the government had deemed Dr. Onyema to be a federal employee in Alexander's case. *ISMIE*, 413 F.Supp.2d at 959. In the alternative, the district court found that HHS's decision not to deem Dr. Onyema a federal employee was contrary to the law. Finding the reasoning of the district court in Alexander's case to be persuasive, the court rejected the elevation of form over substance and found that Dr. Onyema was no less a contractor simply because he signed the contract through his professional corporation. The court thus ruled that Dr. Onyema should be deemed a federal employee. *ISMIE*, 413 F.Supp.2d at 961.

This strange history of Dr. Onyema's three odysseys through the Northern District of Illinois brings us to the instant appeal where Alexander argues that the district court lacked subject matter jurisdiction over the case. Specifically, Alexander contends that Dr. Onyema could not be deemed a federal employee as a contractor of a publicly funded health center because he had no direct contract with the health center. Alexander asks us to reverse and remand with directions to dismiss the case for lack of jurisdiction so that the district court may return the matter to the state court where it originated. The government counters that even if the original deeming determination was in error, all of the parties are statutorily bound by the government's decision. Moreover, the government contends, the deeming decision in combination with the certification that Dr. Onyema was acting within the scope of his employment at the time of the relevant incident gives rise to federal jurisdiction. The government contends that a positive deeming decision by HHS is essentially unreviewable under section 233(g)(1)(F), but concedes that the Attorney General's scope of employment certification is judicially reviewable.

Of course, Alexander challenges only the deeming decision and not the scope of employment certification and that must be the focus of our analysis.

Section 233(g)(1)(F) provides, as we noted above, that once the Secretary deems an employee or contractor to be an employee of the Public Health Service, that determination "shall be final and binding upon the Secretary and the Attorney General and other parties to any civil action or proceeding." Alexander seems to concede that the Secretary's decision to deem a contractor to be an employee of the PHS is final, binding, and not subject to review but argues that 233(g)(1)(F) references only the deeming decision and not the determination of whether one is a contractor in the first place. Determining who is a "contractor," Alexander argues, is a reviewable decision, and the government here conceded that it erred when it characterized Dr. Onyema as a contractor.

Alexander cites three appellate court cases in support of her claim that a party must be a direct contractor with a publicly funded health center in order to qualify for deemed employee status. *See Dedrick v. Youngblood*, 200 F.3d 744 (11th Cir. 2000); *Allen v. Christenberry*, 327 F.3d 1290 (11th Cir. 2003); *El Rio Santa Cruz Neighborhood Heath Ctr. v. U.S. Dep't of Health and Human Servs.*, 396 F.3d 1265 (D.C. Cir. 2005). In each of these cases, however, the government refused to deem the doctor involved to be a federal employee. Nothing in section 233 or in 28 U.S.C. § 2679 (which the government also invoked when removing the case to federal court) prohibits review of the government's refusal to deem a contractor to be an employee of the PHS. None of these cases addresses whether the government's positive determination that a person (natural or corporate) is a contractor is reviewable. Neither party to this litigation points us to any case where a court has addressed this very fine distinction that Alexander

seeks to draw. We have been unable to find a case directly on point.

That said, the distinction that Alexander seeks to draw between deciding who is a contractor and which contractors may be deemed federal employees is a false one. Before deciding whether to deem a contractor of a federally funded health center to be an employee of the public health service, the government must necessarily first decide whether the party at issue is a contractor with a qualifying entity. No one disputes that Sinai was a qualifying entity. The government's threshold determination that Dr. Onyema was a contractor of Sinai (even though the contract was through his eponymous professional corporation) is necessarily part of the deeming decision and is entitled to the same treatment as the deeming decision itself. The final and binding nature of the government's determination would be meaningless if the losing party could challenge the government's interpretation of each word in section 233(g)(1)(F). We note that the final and binding nature of the government's determination binds not just the plaintiff and the doctor but also binds the government. In this case, if the jury had found in favor of Alexander, the government would have been liable for the judgment even though the government later determined that Dr. Onyema was not entitled to the government's protection.

A recent Supreme Court decision lends further support to our conclusion that the district court possessed subject matter jurisdiction over the case even though the United States was admittedly mistaken in its certification. *See Osborn v. Haley*, 127 S. Ct. 881 (2007). Osborn, the plaintiff, worked for Land Between the Lakes Association ("LBLA"), a private company that contracted with the United States Forest Service. She applied for a trainee position with the Forest Service. Haley was in charge of hiring decisions and he hired someone else for the position.

Osborn ridiculed Haley at the meeting where his hiring decision was announced and she then refused her supervisor's directive to apologize to Haley. Osborn subsequently filed a complaint with the United States Department of Labor, asking that the hiring decision be investigated. The investigation resulted in a finding that hiring procedures had been properly followed. Osborn's supervisors again asked her to apologize to Haley and when she again refused, she was fired. She sued Haley in state court for tortiously interfering with her employment relationship with LBLA, charging that Haley induced LBLA to fire her. The Attorney General certified that Haley was acting within the scope of his employment at the time of the incident out of which Osborn's claim arose, and removed the case to federal court. The government asked that the United States be substituted for Haley as the defendant and that the action be dismissed for failure to exhaust administrative remedies. Osborn opposed the substitution of the United States as the defendant, arguing that Haley's conduct was outside the scope of his employment. The district court agreed and overruled the certification on the scope of employment. Because the United States was no longer a party, there was no diversity of citizenship and no federal law at issue, the district court then remanded the case to state court. When the United States moved for reconsideration, the court clarified that the certification was improper because the United States denied the occurrence of the event central to Osborn's claim.

The United States appealed. The Supreme Court remarked that section 2679(d)(2) provides that certification by the Attorney General "shall conclusively establish scope of office or employment for purposes of removal." *Osborn*, 127 S. Ct. at 894. This provision, the Court noted, differs markedly from the command of section 2679(d)(3), which addresses cases in which the Attorney General

refuses to certify the scope of employment. In such a case, the defendant employee may petition the court to make the scope of employment certification; if the case was filed in state court, the Attorney General is then permitted but not required to remove the case to federal court. If the court subsequently determines that the employee was not acting within the scope of his or her employment, section 2679(d)(3) commands that the action "shall be remanded to the State court." The Court found that, in contrast, in cases where the Attorney General affirmatively certifies the scope of employment, "Congress gave district courts no authority to return cases to state courts on the ground that the Attorney General's certification was unwarranted." *Osborn*, 127 S. Ct. at 894. Rather, the Attorney General's certification "is conclusive for purposes of removal." 28 U.S.C. § 2679(d)(2). That section, the Court held, did not preclude the district court from re-substituting the original defendant for the purposes of trial if the court determined, post-removal, that the Attorney General's scope of employment certification was incorrect. "For purposes of establishing a forum to adjudicate the case, however, § 2679(d)(2) renders the Attorney General's certification dispositive." *Osborn*, 127 S. Ct. at 894. Otherwise, the "conclusive" language of section 2679(d)(2) would be meaningless. The Court opined that Congress adopted the "conclusive for purposes of removal" language to "foreclose needless shuttling of a case from one court to another." *Osborn*, 127 S. Ct. at 895 (quoting *Gutierrez v. Martinez-Lamagno*, 515 U.S. 417, 433 n.10 (1995)).

The Court then addressed the question left open by *Lamagno*, whether Article III permits treating the Attorney General's certification as conclusive for the purposes of removal but not for purposes of substitution. *Osborn*, 127 S. Ct. at 896. The problem, the Court noted, was that a case could be locked into federal court even though the United States was not a party, there was no diversity of

the parties, and no federal question was at issue in the litigation. The Court concluded that Article III allowed this result because a significant federal question would have arisen at the outset, specifically, whether the defendant had Westfall Act immunity. The case would thus "arise under" federal law as that term is used in Article III. The Court found that considerations of judicial economy, convenience and fairness to the litigants made it reasonable and proper for a federal court to proceed to final judgment once it had invested the time and resources to resolve the pivotal scope-of-employment question. *Osborn*, 127 S. Ct. at 896.

In the instant case, the Attorney General certified pursuant to section 233 that Sinai was a federally funded health center and that Dr. Onyema was acting within the scope of his employment at Sinai at the time of the incidents giving rise to the complaint. In the notice of removal, the United States invoked both section 233 and section 2679(d)(2). Given the invocation of section 2679(d)(2), the very section the Supreme Court analyzed in *Osborn*, the question of subject matter jurisdiction has been answered by *Osborn*. The district court possessed subject matter jurisdiction over the case because a significant federal question arose at the outset, specifically whether Dr. Onyema could be deemed an employee of the pubic health system due to his professional corporation's contract with Sinai.[5] The government answered that question af-

---

[5] We pause to emphasize that nothing in our holding conflicts with the decisions of the Eleventh and the D.C. Circuit courts regarding situations where a doctor contracted with a publicly funded health center through a professional corporation rather than personally and individually. *See Dedrick v. Youngblood*, 200 F.3d 744 (11th Cir. 2000); *Allen v, Christenberry*, 327 F.3d 1290 (11th Cir. 2003); *El Rio Santa Cruz Neighborhood Health Ctr. v.*
(continued...)

firmatively, albeit mistakenly. Under section 233, neither party could challenge the certification, and under section 2679(d)(2), the certification was conclusive for purposes of removal. *Osborn* determined that a federal court could retain jurisdiction over a case that was removed with an erroneous certification without offending Article III. We therefore reject Alexander's challenge to subject matter jurisdiction and turn to the remaining issues in her appeal.

## II.

Alexander contends that the district court erred in granting a directed verdict for Mount Sinai Hospital, the entity that employed two of the physicians who treated Christen Crutcher. She also faults the district court for a number of evidentiary rulings and for allowing certain comments by defense counsel during opening and closing statements. Finally, she complains that the court itself made remarks in the presence of the jury that were unduly prejudicial, denying her a fair trial.

## A.

Christen Crutcher ("Crutcher") had a mass near her uterus beginning sometime in the 1980s. In 1992, she was

---

[5] (...continued)
*U.S. Dep't of Health and Human Servs.*, 396 F.3d 1265 (D.C. Cir. 2005). In none of those cases was the court faced with a positive certification by the Attorney General. In *Dedrick*, the physician sought certification from the court. In *Allen*, HHS refused to certify the defendants-physicians and they sought to overturn that ruling in the district court. And in *El Rio Santa Cruz*, HHS also denied certification to the defendant-physicians. As we have noted, the statutes involved treat positive certification decisions very differently from denials of certification.

referred to Dr. Onyema for examination of this mass. Dr. Onyema ordered an ultrasound and decided to simply monitor the situation because the mass had not changed in size since the last ultrasound in the 1980s and because Crutcher was not in pain. Crutcher returned to Dr. Onyema approximately five years later complaining of pain in her lower right side for six months. An ultrasound and CT scan revealed that the mass had not changed in size or location but Dr. Onyema discussed surgery with Crutcher because the mass had become symptomatic. Dr. Onyema's plan for surgery was to examine the mass laparoscopically to determine if it was fibroid or benign. If he found the mass was fibroid or benign, he intended to do nothing further. If the mass involved the ovary, he planned to remove it because he believed that for a woman Crutcher's age (she was 66), any mass involving the ovary was presumed malignant until proven otherwise. Dr. Onyema discussed the various risks of the surgery with Crutcher and she decided to proceed with the surgery.

On October 2, 1997, Crutcher underwent surgery at Mount Sinai Hospital. Dr. Onyema was assisted by Dr. Gazala Siddiqui, a first year resident. Dr. Onyema began with the laparoscopic procedure, which involved inserting a scope or camera into the abdomen. He encountered dense adhesions which prevented him from seeing the pelvic organs with the scope so he switched to an open procedure. For the open procedure, third year resident Dr. Jennifer Moran joined the surgical team. In order to reach and remove the mass, Dr. Onyema used blunt dissection of the adhesions, separating them mainly by hand. He removed the mass, measuring six to seven centimeters, and sent it to pathology for analysis. The pathologist later determined the mass was benign. Dr. Siddiqui wrote orders for Crutcher's care immediately after the surgery and was the first doctor to examine her the next morning. Dr. Siddiqui heard crackles at the base of Crutcher's lungs,

a finding that is sometimes seen after surgery because patients do not breathe deeply due to incision pain. Dr. Siddiqui ordered a device to help Crutcher breathe more deeply and ordered a urinalysis to determine the source of a slight fever Crutcher had the prior night. Dr. Onyema spoke with Dr. Siddiqui that morning and then examined Crutcher himself. Both doctors noted that Crutcher's abdomen was soft and non-tender and that she had reduced bowel sounds. These were considered normal findings in the first day following surgery. Dr. Onyema decided that Dr. Siddiqui's orders were adequate. Dr. Siddiqui ordered additional antibiotics later that day.

The next day, because Crutcher's fever had increased, Dr. Bruce Smith, the senior obstetrics/gynecology resident on call, was asked to evaluate Crutcher. He noted that she had the symptoms of ileus, an obstruction of the bowel. He also observed crackles in both lungs, a rapid heartbeat and rapid breathing. A lab report showed an elevated white blood cell count. Dr. Smith's plan was to rule out pneumonia with a chest x-ray, to rule out a small bowel obstruction with abdominal x-rays,[6] and to rule out a post-operative infection. He also thought Crutcher should receive additional antibiotics and that if bowel obstruction was ruled out, she should receive a bowel motility drug. Dr. Smith conveyed his assessment and plan to Dr. Onyema who agreed to the plan. As the morning progressed, Crutcher complained of shortness of breath and abdominal pain, and displayed some confusion. She continued to have crackles in her lungs. The chest x-ray indicated pneumonia and Crutcher was then given triple antibiotics. By 4 p.m., Crutcher said she was feeling better,

---

[6] The abdominal x-rays showed there was no free air in Crutcher's abdomen, a finding which apparently influenced subsequent actions by her physicians.

no longer had shortness of breath, and felt like she needed to move her bowels but could not do so.

The next morning, October 5th, Crutcher had a bowel movement and was given respiratory therapy to help her clear fluid from her lungs and breathe more easily. Her fever had gone down to 100°. Dr. Smith examined Crutcher that morning and found that she still had crackles in both lungs, was still breathing rapidly and had a rapid heartbeat. She also had a slight, bloody discharge from her surgical wound (which was otherwise intact) and abdominal distention. Dr. Smith noted that Crutcher had pneumonia. He also assessed her for ileus, noting that she had moved her bowels and passed gas, but also had decreased bowel sounds and abdominal distention. He assessed her for wound infection and noted she was on triple antibiotics. His plan was to repeat the chest x-ray and obtain an infectious disease consult.

Dr. Moran also saw Crutcher that day after receiving a report on her condition from Dr. Smith. Crutcher told Dr. Moran she was feeling somewhat better but Dr. Moran noted that her breathing was labored, her blood pressure was elevated, her heart and respiratory rates were elevated, and she was using extra muscles from her chest and neck to breathe. Dr. Moran noted abnormal sounds in the lungs and poor air entry. Dr. Moran also observed the Crutcher's abdomen exhibited a small amount of oozing, redness and bruising. Dr. Moran reviewed Crutcher's latest tests, which showed a significantly elevated white blood cell count and pulmonary edema, among other things. Dr. Moran concluded that Crutcher had pulmonary edema with pneumonia. She planned to continue administering oxygen, prescribed a diuretic, and continued the triple antibiotics. Her notes indicated she intended to attempt to contact the infectious disease specialist again, planned to ask her senior resident to see Crutcher, and then intended to speak to Dr. Onyema again

to get his input. After Dr. Moran discussed Crutcher's condition with Dr. Onyema, he cancelled the infectious disease consult and directed Dr. Moran to consult the pulmonary service instead. Dr. Moran called in Dr. Joseph Rosman, a critical care/pulmonologist employed by Sinai for an evaluation of Crutcher's condition. Dr. Rosman concluded that Crutcher was suffering from Acute Respiratory Distress Syndrome ("ARDS") and he approved Crutcher's transfer to the medical intensive care unit ("MICU") where the MICU fellow, residents and attending staff took over her care. He suspected the ARDS was caused by sepsis which was brought about by the pneumonia.

Dr. Rosman was aware that the abdominal x-rays had revealed no free air in Crutcher's abdomen. Free air would have been a strong indication of a bowel perforation which would have been another source of infection leading to Crutcher's mounting medical problems. Once in the MICU, Crutcher was placed on a ventilator to assist her breathing. Over the next few days, Crutcher's condition deteriorated. On October 6th, Dr. Moran examined Crutcher and found she had a soft, non-tender, non-distended abdomen, with positive bowel sounds, a clean and dry incision, and reduced redness and swelling at the incision site. A few hours later when Dr. Onyema examined Crutcher, her abdomen was slightly distended, her incision was dry, and bowel sounds were present. The next day, her abdomen was more distended but bowel sounds were still present. On the afternoon of October 7th, Crutcher began having problems with her organs. Dr. Onyema called in a cardiologist for a consult. The cardiologist noted that Crutcher's abdomen was rigid and distended and recommended that a surgical re-exploration be done. The MICU fellow ordered a CT scan for October 8th to see if Crutcher had an infection in her abdomen.

On October 9th, Dr. Rosman examined Crutcher and noticed that the ordered CT scan had not yet been performed. Because Crutcher's abdomen was distended, he called the radiologists and urged them to perform the CT scan quickly. The scan showed a collection of fluid and two "pockets" in the abdomen. Dr. Rosman arranged to have a catheter inserted in Crutcher's abdomen to drain the fluid. The catheter was placed on October 10th and revealed that Crutcher had an abscess, a collection of infected fluid in her abdomen. After draining this fluid, Crutcher's condition improved slightly over the next few days but then the drainage from the catheter began to increase. On October 13th, Dr. Onyema requested an infectious disease consult and on October 15th, he requested a general surgical consult. Dr. Sasa Korner performed exploratory surgery on October 16th and found a hole in Crutcher's small bowel which he repaired by removing fifty-five centimeters of the bowel. A pathologist's analysis of the removed tissue showed two holes. Unfortunately, Crutcher's condition continued to deteriorate and she died on November 13th of multi-system organ failure, which in turn was attributed to the perforated bowel.

Crutcher's daughter, Irma Alexander, filed a malpractice action in the Circuit Court of Cook County against Mount Sinai Hospital Medical Center of Chicago and Sinai Health System d/b/a Mount Sinai Medical Center of Chicago ("Mount Sinai Hospital"), Sinai Medical Group ("Sinai"), Godwin Onyema and Joseph Rosman. We have already noted the path the litigation took to federal court. Under the FTCA, the United States was substituted for Dr. Onyema. The case against the United States was tried to the judge at the same time the case against the other defendants was tried to a jury. At the close of the plaintiff's case, Sinai, Mount Sinai Hospital and Dr. Rosman moved for a directed verdict. The court denied

the motion as to Dr. Rosman but granted it in favor of
Sinai (except to the extent that Sinai was vicariously liable
for Dr. Rosman's conduct as his employer) and in favor
of Mount Sinai Hospital. The jury returned a verdict in
favor of the remaining defendants and the court entered
judgment in favor of the United States.

**B.**

We turn first to the directed verdict in favor of Mount
Sinai Hospital. The parties agreed that Mount Sinai
Hospital was liable only through the actions of its employ-
ees, Dr. Moran, Dr. Siddiqui and Dr. Smith.[7] Recall that
Dr. Moran was a third-year resident, Dr. Siddiqui was a
first-year resident and Dr. Smith was a senior (fourth-
year) resident at the time of these events. At trial, Dr.
Ronald Berman testified as an expert for Alexander. Dr.
Berman opined that Crutcher developed ARDS by October
5th. He testified that the chances of Crutcher surviving
ARDS at that point were 50-60% and that those odds
decreased as time passed. Dr. Berman testified that "[t]his
was Dr. Onyema's patient. He is in charge." R. 128-5, at
711. In his testimony regarding Dr. Onyema, Dr. Berman
criticized Dr. Onyema for relying on telephone reports
from residents rather than coming in to see the patient
himself when she was apparently more ill than would be
expected following surgery. He opined that the residents
"have less experience; and, the more junior the resident,
the less you expect." R. 128-5, at 714. The standard of
care for residents, Dr. Berman stated, was to know the
indications and contra-indications to any surgical proce-
dure in which they participate, to know the complications

---

[7] Dr. Rosman was employed by Sinai and not by Mount Sinai
Hospital, which was a separate and distinct corporation.

of those surgical procedures, to be able to diagnose those complications if the patient showed signs of them, and to treat those complications in a timely fashion. R. 128-5, at 720. When Dr. Berman opined that the residents should have requested a surgical consult on October 5th, Mount Sinai Hospital objected that Dr. Berman had not previously disclosed this opinion and that he was not distinguishing between the residents who had varying levels of experience and varying contacts with Crutcher after her surgery. The court struck Dr. Berman's testimony and directed plaintiff's counsel to be more careful in questioning Dr. Berman so that it would be clear which resident was involved in the particular criticism. Dr. Berman subsequently testified that Dr. Moran deviated from the applicable standard of care by not requesting a surgical consult on October 5th and that Dr. Siddiqui violated the standard of care by not ordering a surgical consult on October 6th. R. 128-5, at 724. Plaintiff's counsel then posed the following question: "And with regard to the requirement that Dr. Smith order surgical consultation on the 4th or the 5th, do you hold such an opinion?" Plaintiff's counsel objected to this question ("Objection, your Honor. The same objection.") because Dr. Berman had not previously disclosed an opinion that Dr. Smith should have ordered a surgical consult on October 4th. The court sustained the objection. Plaintiff's counsel did not narrow the question to the October 5th time frame and instead asked other questions. The court continued to sustain objections to broadly worded questions and broadly worded responses from Dr. Berman. The effect of those rulings was that Dr. Berman essentially offered no further admissible critique of the residents.

On cross-examination, Dr. Berman conceded that Drs. Moran and Siddiqui did nothing wrong during the surgery itself. He also testified that neither Dr. Moran nor Dr. Smith violated the standard of care by failing to diagnose

ARDS. When asked about Crutcher's chances for survival after October 5th, Dr. Berman could state only that once Crutcher was diagnosed with ARDS, her chances of survival were 50-60% and decreasing on an unknown scale each day. Dr. Berman acknowledged that there was no way of quantifying the daily decrease in Crutcher's chances for survival and that he could not say whether her chances on October 6th or later would have been 50% or 1%. Finally, Dr. Berman testified that he could not predict whether a surgeon called in on October 5th would have recommended surgery given Crutcher's precarious medical condition at that time. R. 128-5, at 799-801.

At the close of the plaintiff's case, Mount Sinai Hospital moved for a directed verdict under Federal Rule of Civil Procedure 50. Counsel for the hospital pointed out that Dr. Siddiqui was not at the hospital on October 6th, the only day for which Dr. Berman criticized her performance. Counsel also noted that there was no admissible opinion given regarding Dr. Smith's performance and that the only criticism remaining was Dr. Berman's opinion that Dr. Moran should have ordered a surgical consult on October 5th. Because Dr. Berman could not predict whether a surgical consult would have resulted in surgery or whether either a consult or surgery would have improved Crutcher's chances of survival, Mount Sinai argued that the case against Dr. Moran was purely speculative. The district court granted the motion, ruling that no reasonable jury could find that the residents violated the applicable standard of care. The court found that there was no basis for imposing liability on the residents for failing to go over Dr. Onyema's head to order a surgical consult.[8]

---

[8] Recall that Dr. Onyema countermanded Dr. Moran's call for an infectious disease consult on October 5th and instead directed her to consult a pulmonary care specialist. As Alexander's

(continued...)

The court noted that Dr. Berman's criticism of Drs. Siddiqui and Smith addressed their conduct on days that they were not physically present at the hospital, which the court characterized as "very, very shoddy testimony." R. 128-5, at 851-2. The court found no reasonable jury would impose liability on Dr. Moran for failing to call for a surgical consult on October 5th because she was a junior resident reporting to Dr. Onyema who did not himself order such a consult, and because by that time, Crutcher had developed ARDS and had only a 50-60% chance of survival no matter what Dr. Moran did.

Alexander complains that the court improperly precluded Dr. Berman from testifying that Dr. Smith deviated from the applicable standard of care by failing to order a surgical consult on October 5th. Alexander also argues that the district court applied the wrong standard when it directed the verdict in favor of the hospital. We review the district court's decision to restrict an expert's testimony as a sanction for failure to disclose the information in discovery for abuse of discretion. *Hoffman v. Caterpillar, Inc.*, 368 F.3d 709, 714 (7th Cir. 2004); *Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir. 2000). For a state law claim, we apply the state's standard of review to the district court's decision to grant a directed verdict. *Consolidated Bearings Co. v. Ehret-Krohn Corp.*, 913 F.2d 1224, 1227 (7th Cir. 1990); *Mele v. Sherman Hosp.*, 838 F.2d 923, 924 (7th Cir. 1988). Alexander's malpractice claims against Mount Sinai Hospital were governed by Illinois law. Illinois case law provides that verdicts should be directed "only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly

---

8  (...continued)
own expert testified, Crutcher was Dr. Onyema's patient and Dr. Onyema was "in charge."

favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 229 N.E.2d 504, 513-14 (Ill. 1967). Illinois law also requires that we review the trial court's directed verdict *de novo. Snelson v. Kamm*, 787 N.E.2d 796, 819 (Ill. 2003); *Suzik v. Sea-Land Corp.*, 89 F.3d 345, 348 (7th Cir. 1996).

We begin with the district court's decision to sustain the objection to the question about Dr. Smith's duty to order a surgical consult on October 4th and 5th. Alexander is correct that Dr. Berman had previously disclosed an opinion that Dr. Smith should have ordered a surgical consult on October 5th. But prior to trial Dr. Berman also opined that no one breached an applicable standard of care by failing to call for a surgical consult **before** October 5th. When counsel for Mount Sinai objected to the question, he was objecting to the reference to October 4th. The court sustained the objection, and counsel for Alexander tried a few more times to elicit the relevant information but continued to ask questions that were non-specific as to particular dates and particular defendants. After additional objections, the court called a sidebar where defense counsel explained that he objected because Dr. Berman did not criticize the residents for certain actions or failures to act before October 5th in opinions expressed prior to trial. Thus, testimony that the residents breached the standard of care before October 5th constituted undisclosed opinions. The court suggested that Alexander's counsel use Dr. Berman's deposition testimony and "accurately phrase a question with what you know to be his opinion." R. 128-5, at 727. When trial resumed, Alexander's counsel failed to elicit an opinion from Dr. Berman about Dr. Smith's obligation to order a surgical consult on October 5th. We see no abuse of discretion in the district court's rulings limiting Dr. Berman's testimony. Contrary to Alexander's claim, the court did not preclude Dr.

Berman from testifying about Dr. Smith's conduct on October 5th. Rather, counsel failed to ask a non-objectionable question to elicit this information. Instead, counsel asked broad questions and Dr. Berman tended to answer in a non-specific manner that was inconsistent with or broader than his deposition testimony. The court was within its discretion to restrict Dr. Berman's testimony to previously disclosed opinions.

The directed verdict is a closer question but after careful review of the trial transcript and the relevant Illinois cases, we conclude that the district court was correct to direct the verdict in favor of Mount Sinai Hospital. The court sustained a number of objections to Dr. Berman's testimony about the residents; the evidence which survived was exceedingly thin. Dr. Berman testified Dr. Moran should have ordered a surgical consult on October 5th and that Dr. Siddiqui should have ordered a surgical consult on October 6th. Dr. Siddiqui, however, did not see or treat Crutcher on October 6th. As we have already noted, there was no admissible evidence regarding a breach of the standard of care by Dr. Smith. Thus, the only evidence of a breach of the standard of care was Dr. Berman's testimony that Dr. Moran should have called for a surgical consult on October 5th. We must view the evidence in the light most favorable to the opponent of the motion for a directed verdict and so we must assume for the purposes of this analysis that Dr. Moran, a third year resident, breached the standard of care by failing to request a surgical consult.[9] At the time of the Rule 50 motion,

---

[9] We emphasize that this is an assumption necessitated by the legal posture of the case. Given that no senior physician thought to order a surgical consult at that time, given that Dr. Onyema countermanded Dr. Moran's orders and had the ultimate authority over the residents, and given that Crutcher's precari-

(continued...)

counsel for the hospital argued that Alexander failed to show that the outcome would have been any different if Dr. Moran had called for a surgical consult on October 5th. In other words, Alexander failed to present evidence that this breach was a proximate cause of Crutcher's injury. First, Alexander presented no evidence that the surgeon would have done anything differently if he had been called in on October 5th. Second, Dr. Berman testified that he could not say with certainty what Crutcher's chances of survival were after October 5th when she was initially diagnosed with ARDS. Indeed he testified that her odds of survival were 50-60% at best and that they decreased in an unknown percentage each day after that. Thus, the effect of calling in a surgeon on October 5th versus on some other day was unknown with any certainty. Defense counsel argued that it would therefore be speculative to conclude that a surgical consult on October 5th would have influenced the outcome. Such speculation could not meet the standards for proximate cause, the hospital argued.

To sustain a claim against Mount Sinai Hospital based on vicarious liability for the conduct of its residents, Alexander was obliged "to present expert testimony to establish the standard of care and that its breach was the cause of the plaintiff's injury." *Snelson*, 787 N.E.2d at 819. Alexander arguably provided sufficient evidence on the standard of care and the breach of that standard through Dr. Berman's testimony. The issue before us is whether she provided adequate evidence that the breach was a cause of Crutcher's injuries. This is where Alexander's case fails. Dr. Berman testified that he could not predict whether a surgeon called in on October 5th would have

---

[9] (...continued)
ous condition weighed against surgical intervention, the jury may well have concluded that Dr. Moran did not breach the standard of care.

recommended surgery given Crutcher's precarious medical condition at that time. R. 128-5, at 799-801. Alexander presented no evidence from a surgeon or other expert that a surgeon would have performed surgery on Crutcher sooner or treated Crutcher differently had the surgeon been called in for a consult on October 5th. Moreover, Dr. Berman acknowledged that there was no way of quantifying the daily decrease in Crutcher's chances for survival and that he could not say whether her chances on October 6th or later would have been 50% or 1%. Thus, there was no evidence that Dr. Moran's delay in calling for a surgical consult in any way contributed to Crutcher's injury. *See Snelson*, 787 N.E.2d at 819 (except in very simple cases, expert testimony is needed to establish that a breach of the standard of care was the proximate cause of the plaintiff's injury).

Alexander's case is analogous to *Snelson* and to *Aguilera v. Mount Sinai Hosp. Med. Ctr.*, 691 N.E.2d 1 (Ill. App. Ct. 1997), *as modified on denial of reh'g* (Jan. 21, 1998). In *Snelson*, the plaintiff sued a hospital for a breach in the standard of care by nurses employed by the hospital. *Snelson*, 787 N.E.2d at 818-23. During a diagnostic test, Snelson had suffered an injury to the artery supplying blood to his small intestine. The doctor performing the test was unaware that he had caused the injury and Snelson was admitted to the hospital under the care of Dr. Kamm, the physician who had ordered the test. Snelson experienced unusual symptoms in the hours following the test including abdominal pain and bloody stool. Dr. Kamm examined Snelson and then left him in the care of nurses for the evening with instructions to closely monitor his condition. The nurses failed to inform Dr. Kamm that Snelson experienced additional pain after the doctor left for the evening. The next morning, after additional tests, Dr. Kamm performed emergency surgery and discovered that 95% of Snelson's small intestine was dead due to

lack of circulation. Dr. Kamm removed the dead intestinal tissue, leaving Snelson with virtually no small intestine. This loss caused serious, lifelong medical consequences for Snelson.

Dr. Kamm had been aware of Snelson's pain before he left, however, and Snelson presented no evidence that Dr. Kamm would have performed surgery earlier if the nurses had informed him of Snelson's continued pain. Thus, the court held that the nurses' conduct could not have been the proximate cause of Snelson's injury even if the nurses deviated from the standard of care by failing to advise Dr. Kamm of Snelson's pain. *Snelson*, 787 N.E.2d at 820. The court noted that Snelson could have presented expert testimony as to what a reasonably qualified physician would do with the undisclosed information and whether the failure to disclose the information was a proximate cause of the plaintiff's injury. Such testimony could discredit a doctor's assertion that the nurses' omission did not affect his decisionmaking. 787 N.E.2d at 821.

In *Aguilera*, the plaintiff arrived in the hospital's emergency room complaining of numbness on one side of his body. He was not given a CT scan for several hours. That scan ultimately revealed a massive brain hemorrhage. The plaintiff subsequently lapsed into a coma and died. In a suit against the hospital, the plaintiff alleged that the delay in the CT scan was a breach of the standard of care that led to his death. The plaintiff's expert testified that if the scan had been completed earlier, a neurosurgeon would have been consulted and surgery could have been attempted before the bleeding caused the irreversible damage that led to the plaintiff's death. 691 N.E.2d at 3-6. The plaintiff's experts conceded that they did not know if a neurosurgeon would have in fact performed surgery if the CT scan had been completed earlier. Both experts testified that they would defer to a neurosurgeon's opinion as to how to proceed. The neurosurgeons who testified

agreed that even if the scan had been performed earlier, they were unlikely to have recommended surgery because of the location of the bleeding deep within the brain. The court held that the "absence of expert testimony that, under the appropriate standard of care, an analysis of an earlier CT scan would have led to surgical intervention or other treatment that may have contributed to the decedent's recovery creates a gap in the evidence of proximate cause fatal to plaintiff's case." *Aguilera*, 691 N.E.2d at 7.

As in *Snelson* and *Aguilera*, Alexander failed to produce any evidence that Dr. Moran's failure to order a surgical consult was a proximate cause of Crutcher's injury. *See also Holton v. Memorial Hosp.*, 679 N.E.2d 1202, 1211-13 (Ill. 1997) (evidence which shows to a reasonable medical certainty that negligent delay in diagnosis or treatment lessened the effectiveness of treatment is sufficient to show proximate cause). Without evidence that the resident's actions proximately caused Crutcher's injury, the court was correct to grant judgment in favor of the hospital. *Aguilera*, 691 N.E.2d at 6 (where there is no factual support for an expert's conclusions, the conclusions alone do not create a question of fact). We affirm the grant of judgment in favor of Mount Sinai Hospital.

## C.

Alexander's remaining arguments fare no better. She asserts that the court committed reversible error when it allowed Dr. Craig Winkel, an expert for the United States, to testify that Crutcher's bowel may have been perforated during the October 16th surgery or that it may have been a delayed perforation rather than a perforation that occurred during the original October 2nd surgery. Early in his testimony, Dr. Winkel stated that he disagreed with Dr. Berman's opinion that Dr. Onyema breached the standard of care by perforating Crutcher's bowel during the October

2nd surgery. Dr. Winkel testified, without objection, that it was not clear to him that Dr. Onyema did in fact perforate the intestine. He also stated that perforating the bowel was a known complication which did not in and of itself indicate substandard care. R. 128-7, at 915-16. He later testified without objection that he was uncertain when the perforation occurred. R. 128-7, at 925. It was within the trial court's discretion to allow Dr. Winkel to testify to opinions that may have differed from his previously disclosed opinions. *Hoffman*, 368 F.3d at 714. On cross-examination, counsel for Alexander was able to question Dr. Winkel about his prior deposition testimony. Alexander's counsel demonstrated that Dr. Winkel had previously testified that, in his opinion, the injury to the bowel "probably occurred" during the October 2nd surgery and was caused by the insertion of the trocar or needle used to perform the laparoscopy. R. 128-7, at 962. Dr. Winkel's testimony was not necessarily inconsistent with his prior opinion; in each instance he spoke of probabilities that did not conclusively exclude other scenarios. Moreover, most of this testimony came in without objection. Any harm caused by the district court allowing Dr. Winkel to testify that (1) he did not know for certain when the perforations occurred, and (2) they may have occurred during the October 16th surgery or on a delayed basis, was cured by the thorough cross-examination by Alexander's counsel.

Alexander also complains that the trial court improperly overruled her objection to a question during the cross-examination of Alexander's other expert witness, Dr. Klotz. Defense counsel asked Dr. Klotz if he was aware that Dr. Moran had irrigated the abdomen to check for leaks in the bowel during the October 2nd surgery. Dr. Moran had testified that was her usual procedure but arguably had not testified that she had performed this irrigation in Crutcher's surgery on October 2nd. The court allowed the

question, ruling "She testified on that topic. And the jury has to recall whether that is what she said. My sense is that that is what was, essentially, described. So, I will permit the question to be put. But whether that was the exact testimony will be for the jury to decide." R. 128-4, at 596-97. The court made clear that it was the jury's recollection that should prevail.[10] In light of that directive, given twice, that it was for the jury to recall the evidence, we find no abuse of discretion and no prejudice from the remark. *See United States v. Brisk*, 171 F.3d 514, 524 (7th Cir. 1999) (judge's admonishment to jury to rely on its own recollection was sufficient to mitigate any possible prejudice from comments not supported by the evidence); *United States v. Dominguez*, 835 F.2d 694, 700 (7th Cir. 1987) (misstatement of the evidence does not necessarily prejudice the jury's ability to weigh the evidence fairly when the court immediately instructs the jury that it is the jury's province to recall what the evidence reflected).

Finally, Alexander complains that she was unduly prejudiced by remarks from defense counsel and from the court. In opening statements, counsel for Dr. Rosman sought to discredit Alexander's experts, particularly Dr. Berman. Counsel stated, "Dr. Berman practiced for many years in Hawaii; retired in 1998; and, since 2002, has been in San Diego doing—well about 80 percent of his experience in the last seven years has been doing 20 to 40 abortions per week at a clinic." R. 128-1, at 68. The court overruled Alexander's immediate objection. Alexander then moved for a mistrial on the ground that the remark was irrelevant, immaterial, highly prejudicial and inflammatory. R. 128-2, at 78. The court denied the motion,

---

[10] In explaining its reasoning for the ruling, the court may have inadvertently endorsed a particular view of the evidence. But in light of the repeated instructions to the jury to rely on its own recollection, we find the court's statement harmless.

finding that the background of expert witnesses is highly relevant to their claimed expertise. Before Dr. Berman testified, Alexander brought a motion *in limine* to exclude references to abortion. The court granted the motion in part, directing the parties to use the word "terminations" rather than abortions in describing Dr. Berman's recent practice. R. 128-5, at 677-78.

A trial judge has broad discretion in determining whether an incident at trial is so serious as to warrant a mistrial. *Testa v. Village of Mundelein, Ill.*, 89 F.3d 443, 445 (7th Cir. 1996). Alexander's counsel objected broadly to the reference to abortions. The court found, and we agree, that the expert's current work experience is highly relevant to his credentials. Alexander was aware before trial that Dr. Berman's recent practice focused in large part on family planning, contraception and pregnancy terminations and yet Alexander failed to move *in limine* before trial to address this issue. Alexander could have moved before trial to preclude the use of the word "abortion" and instead require counsel to refer to "terminations," the term the court ultimately approved for the testimony of Dr. Berman. Instead, Alexander objected broadly to **any** reference to this part of Dr. Berman's practice no matter what term was used. The court did not abuse its discretion in allowing defense counsel to mention this part of Dr. Berman's current practice because it was highly relevant to his credentials as an expert. Once Alexander asked the court to limit the references to a less charged term, the court agreed and prohibited defense counsel from again using the word "abortion." We find no abuse of discretion in the court's handling of the issue, and note that Alexander's counsel could have avoided the problem entirely by filing the motion *in limine* before trial began. We have considered the other remarks to which Alexander has objected, including remarks by both defense counsel and the court, and find that none warrants a new trial.

### III.

For the reasons stated, we find that the district court properly exercised jurisdiction over the case, and we affirm the judgment in every respect.

AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*