RAMONA PUMALA, Plaintiff-Appellant, v. STEPHEN SIPOS, Defendant-Appellee.

Second District   No. 2—87—0123

Opinion filed November 18, 1987.—Rehearing denied January 19, 1988.

Leonard M. Ring and Margaret A. McGuire, both of Leonard M. Ring & Associates, of Chicago, for appellant.

Robert Marc Chemers, David J. Loughnane, and Michael G. Bruton, all of Pretzel & Stouffer, Chartered, of Chicago, for appellee.

JUSTICE DUNN delivered the opinion of the court:

Plaintiff, Ramona Pumala, appeals from the trial court's order which granted the motion for a directed verdict by defendant, Dr. Stephen Sipos, who died prior to the commencement of trial. Plaintiff brought a medical malpractice action against the defendant alleging that his failure to refer her to an orthopedic specialist in a timely manner resulted in the amputation of her right leg. On appeal, plaintiff contends that the trial court erroneously granted a directed verdict where she presented a *prima facie* case against the defendant for malpractice and the trial court improperly prevented her expert from rendering his opinion at trial regarding defendant's deviation from the standard of care and the proximate cause of the amputation.

Plaintiff originally filed an appeal with this court concerning the issue of whether the statute of limitations had expired. The trial court had granted defendant's motion to dismiss on this basis. We reversed and remanded the cause for further proceedings in *Pumala v. Sipos* (1985), 131 Ill. App. 3d 845, 476 N.E.2d 462.

The relevant facts adduced at trial reveal that defendant was plaintiff's family physician and had last treated her on June 19, 1978. In 1973, defendant first noticed a lump near the plaintiff's right knee. Defendant diagnosed the condition as benign osteochondroma, a bone tumor, based on the results of a biopsy and X rays. After experiencing continuing problems with her leg, in 1975 plaintiff underwent surgery to remove a calcium deposit and torn cartilage from her knee under the direction of the defendant and an orthopedic surgeon. Based on additional X rays and a biopsy, defendant again diagnosed the condition as benign osteochondroma.

Plaintiff testified that after knee surgery she continued to experience pain, swelling, and trouble moving the knee. While hospitalized for unrelated chest pain, plaintiff complained to defendant regarding her knee problem. Plaintiff also sought treatment for a rash in June 1978, at which time she reported to defendant that she had pain and difficulty with her knee. Defendant opined that a calcium deposit had grown back and would need to be removed. Plaintiff testified that between 1978 and 1981, she had telephoned defendant on four occasions because "the leg was still hurting, it was still growing. I was still having the limping problem, a lot of pain, [and] swelling." Plaintiff was precluded from testifying regarding the substance of the conversations with the defendant due to the Dead Man's Act (Ill. Rev. Stat.

1985, ch. 110, par. 8—201).

In 1981, defendant referred plaintiff to Dr. Gerard Goshgarian, an orthopedic surgeon. Dr. Goshgarian testified that in the six months preceding his evaluation of plaintiff, her condition had "really changed for the worse." From the clinical examination and X rays, Dr. Goshgarian determined that plaintiff had a serious problem and referred her to the Mayo Clinic.

Dr. Thomas Shives, at the Mayo Clinic, examined plaintiff on August 12, 1981. Testing revealed that plaintiff had high grade osteosarcoma, a malignant bone tumor. After reviewing X rays taken in 1975, Dr. Shives indicated that plaintiff actually had osteosarcoma at that time. Plaintiff's attorney did not inquire whether defendant's misdiagnosis breached the standard of care at the time. Dr. Shives further stated that he performed an amputation about eight centimeters above the highest extent of the tumor on the right thigh above the knee. When asked if a less radical surgery could have been performed in 1977 that did not involve amputation, Dr. Shives responded, "It's possible." On cross-examination, Dr. Shives indicated that he could not testify to a reasonable degree of medical certainty whether limb salvage could have been performed. Dr. Shives reported that he did not have all the factors to express an opinion.

Dr. Emerson Day, plaintiff's medical expert, testified that between 1973 and 1981, the medical records revealed that plaintiff had a growth in the right knee area which was diagnosed as osteochondroma. The accepted medical practice for treatment of osteochondroma was "supportive care when needed and otherwise leave it alone." Prior to 1978, the record did not demonstrate any deviation from the applicable standard of care. Dr. Day did not testify that clinical testing revealed osteosarcoma and that defendant misdiagnosed the problem. Instead, plaintiff attempted to elicit testimony from Dr. Day that from 1978 until 1981 defendant should have referred plaintiff to a specialist and that his failure resulted in an amputation. Dr. Day could not render his opinion regarding defendant's care of plaintiff from 1978 on because no record of treatment existed. The substance of plaintiff's telephone conversations with the defendant was not in evidence.

Plaintiff's attorney persisted in his attempts to elicit evidence regarding the standard of care from Dr. Day over defendant's objections. Plaintiff's attorney was permitted to ask, "Does the family practitioner in 1979, 1980, who has been treating a patient with an osteosarcoma which continues to grow even after the patient has reached skeletal maturity, does that family practitioner have a respon-

sibility under the applicable standard of care to see that patient or refer that patient for medical attention?" Dr. Day answered, "Yes, he does." Further hypotheticals were excluded, however, on the basis that they assumed facts not in evidence.

Regarding the issue of proximate cause, Dr. Day was asked at what point the cancer would have had to be diagnosed so that the leg would not have had to be amputated. Dr. Day responded:

"I believe it's almost impossible to say at what point in time. Certainly, every month that passes, the chances one can be conservative in cure are reduced. In other words, as time passes, cancer tends to spread so that the earlier one makes a diagnosis and treats, the better in terms of the ability to cure with less extensive surgery. I don't know how anyone could say when, in the case of Ms. Pumala, that that would have been curable by local excision rather than amputation. Some point in time, I believe, it would have been.

* * *

MR. ABRAHAMSON [plaintiff's attorney]: In so far as a comparison between earlier films, '75, '76, '77 and then 1981, given the size of the tumor as demonstrated in those films, do you have an opinion as to when the tumor might have been resected without the necessity of a total loss of a limb?

DR. DAY: Again, hard to say. Certainly one would have believed that in the interval, '75, '76, '77, based on the films we saw, it was in the limb slowly growing, and at that point, I would think might well have been cured with a wide enough excision without sacrifice to the limb. But as I said, the only way you can tell would be to actually carefully dissect and have a pathologist determine how far the tissues were involved."

The court refused plaintiff's offer of proof to establish the standard of care through 1981 because the testimony regarding the communications with the defendant was not allowed. The court found no predicate for an opinion.

The trial court granted defendant's motion for a directed verdict indicating that there had been no testimony to establish a standard of care owed by Dr. Sipos or to establish a breach of that standard of care. The court further explained that the testimony regarding proximate cause was unsatisfactory. No evidence was presented which would indicate that earlier referral would have avoided amputation. No doctor testified, based on the record with any degree of certainty, that amputation would not have been necessary.

■ Plaintiff's first contention is that she set out a *prima facie*

case against the defendant that should have withstood the directed verdict motion. A directed verdict in favor of a defendant is appropriate when plaintiff has not established a *prima facie* case. (*Victory Memorial Hospital Association v. Schmidt, Garden & Erickson* (1987), 158 Ill. App. 3d 931, 934, 511 N.E.2d 953.) Plaintiff must present at least some evidence on every element essential to his cause of action or the defendant is entitled to judgment in his favor as a matter of law. *Kokinis v. Kotrich* (1980), 81 Ill. 2d 151, 154-55, 407 N.E.2d 43.

In order to prove a case of negligence in treatment against a medical professional, the plaintiff must prove: (1) the proper standard of care against which the professional's conduct must be measured; (2) a negligent failure to comply with the standard; and (3) that the injury for which the suit is brought had as one of its proximate causes the negligence of the professional. (*Ingle v. Hospital Sisters Health System* (1986), 141 Ill. App. 3d 1057, 1064, 491 N.E.2d 139.) The trial court in this case determined that plaintiff failed to provide evidence that defendant deviated from a standard of care and that defendant's omission caused injury to her. If the trial court's judgment is correct, it may be sustained on any ground warranted regardless of the reason given by the trial court. (*Material Service Corp. v. Department of Revenue* (1983), 98 Ill. 2d 382, 387, 457 N.E.2d 9.) Apart from the standard of care issue, we affirm on the ground that the evidence did not reveal that the alleged negligence of defendant caused plaintiff's leg amputation.

A directed verdict should not be entered for the defendants unless all the evidence viewed in the aspect most favorable to the plaintiff so overwhelmingly favors the defendants that no contrary verdict based on the evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.) Plaintiff, however, must present some evidence of proximate cause. The burden of proof requirements of the medical malpractice case do not require the plaintiff to prove that a better result would have been achieved absent the alleged negligence of the doctor. (*Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 424, 328 N.E.2d 301.) In a medical malpractice case, plaintiff must prove that it is more probably true than not true that defendant's negligence was a proximate cause of the plaintiff's injury. (*Russell v. Subbiah* (1986), 149 Ill. App. 3d 268, 272, 500 N.E.2d 138.) Plaintiff must present evidence which shows with a reasonable degree of medical certainty that a negligent delay in diagnosis or treatment lessened the effectiveness of treatment in order to establish proximate cause in this case. *Northern Trust Co. v. Louis A.*

*Weiss Memorial Hospital* (1986), 143 Ill. App. 3d 479, 487, 493 N.E.2d 6.

Our review of the record reveals that Dr. Shives testified "It's possible" in response to plaintiff's question regarding whether less radical surgery could have been performed as late as 1977. However, on cross-examination, Dr. Shives explained that he could render no opinion with a reasonable degree of medical certainty regarding whether amputation could have been avoided. Therefore, plaintiff has not presented evidence that shows with a reasonable degree of medical certainty that defendant's alleged negligence lessened the effectiveness of her treatment.

Similarly, Dr. Day indicated that, generally, the earlier the disease was detected, the better were the chances to cure it with less extensive surgery. Dr. Day admitted that he did not know "how anyone could say when, in the case of Ms. Pumala, that that would have been curable by local excision rather than amputation." Dr. Day's testimony does not support plaintiff's allegations that defendant's failure to treat her properly resulted in amputation. Dr. Day could not testify to a reasonable degree of medical certainty, and he could not say that it was more probable than not that amputation occurred as a result of defendant's negligence. Therefore, the testimony regarding proximate cause was insufficient to present a question for the jury.

■■ ■ Plaintiff's second contention is that Dr. Day should have been allowed to render his opinion regarding defendant's negligence and causation. Specifically, plaintiff challenges the trial court's exclusion of the following hypothetical question:

> "MR. ABRAHAMSON [plaintiff's attorney]: Do you have an opinion, Doctor, based upon a reasonable degree of medical knowledge that had Ms. Pumala been seen in 1979 and had the malignancy, the cancer in her right knee, right distal femur, been diagnosed, if there would have been any change or any other treatment available to her other than an amputation of her right extremity?"

Plaintiff argues that the exclusion of this hypothetical question constitutes reversible error. We conclude that if any error occurred it was harmless error. This question had already been asked and answered. Dr. Day's response to prior questions indicates that he could not have testified with a reasonable degree of medical certainty that other treatment, besides amputation, which would save the limb could have been performed prior to 1981. A mere possibility is not sufficient to sustain the burden of proof of proximate cause. The causal connection must not be contingent, speculative or merely possible. *Borowski v.*

*Von Solbrig* (1973), 14 Ill. App. 3d 672, 680, 303 N.E.2d 146, *aff'd* (1975), 60 Ill. 2d 418, 328 N.E.2d 301.

Having concluded that the plaintiff has failed to provide sufficient evidence of proximate cause, we need not address whether plaintiff has sustained her burden of providing adequate evidence on the elements of standard of care and breach of standard of care. Accordingly, we affirm the trial court's order directing a verdict in defendant's favor.

Affirmed.

WOODWARD and HOPF, JJ., concur.