HILDA AGUILERA, Indiv. and as Special Adm'x of the Estate of Salvador Aguilera, Deceased, and as Mother and Next Friend of Leticia Aguilera, *et al.*, Minors, Plaintiff-Appellant, v. MOUNT SINAI HOSPITAL MEDICAL CENTER *et al.*, Defendants-Appellees.

First District (3rd Division)    No. 1—94—1893

Opinion filed December 10, 1997.—Modified on denial of rehearing January 21, 1998.

Robert A. Holstein and Martin K. Berks, both of Law Offices of Robert A. Holstein & Associates, P.C., of Chicago, for appellant.

Lord, Bissell & Brook, of Chicago (Hugh C. Griffin, Diane I. Jennings, Leslie J. Rosen, and Stephanie A. Burris, of counsel), for appellee Mount Sinai Hospital Medical Center.

JUSTICE CAHILL delivered the opinion of the court:

We revisit, at the direction of our supreme court, an action for survival and wrongful death based on medical malpractice. The jury found for plaintiff and awarded substantial damages. The trial court entered judgment notwithstanding the verdict, finding "that no reasonable fact finder could conclude that the death of the *** decedent was proximately caused by the failure *** to conduct a CT scan *** in a more timely fashion." Plaintiff appealed.

In *Aguilera v. Mt. Sinai Hospital Medical Center*, 282 Ill. App. 3d 363, 668 N.E.2d 94 (1996), we affirmed the trial court's judgment notwithstanding the verdict. On June 4, 1997, our supreme court ordered that we reconsider our decision in light of *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 679 N.E.2d 1202 (1997). We withdrew our opinion and invited the parties to rebrief the case in light of *Holton*. After reviewing the case under the guidance of *Holton*, we again affirm the judgment notwithstanding the verdict entered by the trial court.

The record shows that in the early morning hours of April 19, 1987, Salvador Aguilera was logged into the emergency room of Mount Sinai Hospital, complaining of numbness on the left side of his body. His brother, who drove him to the hospital, said they arrived at 2 a.m., but hospital records show Aguilera arrived at 3 a.m. Whatever the hour, the parties disagree about the care and treatment Aguilera received over the next several hours. Plaintiff's expert

medical witnesses testified that the treatment deviated from the standard of care. Defense expert medical witnesses testified that it did not.

Aguilera was formally admitted to the hospital, taken from the emergency room, and assigned to a room at approximately 7 a.m. At about 8:20 a.m. he began to suffer seizures. At about 9:30 a.m. he was given a CT scan that revealed a massive intracerebral hemorrhage measuring 4 by 6 centimeters. Aguilera lapsed into a coma that day and died of cardiac arrest three days later. The death certificate recorded that Aguilera died from cardiopulmonary arrest secondary to a cerebral hemorrhage.

Both of plaintiff's expert medical witnesses testified that the failure of the emergency room physician to order an earlier CT scan while Aguilera was undergoing treatment and observation in the emergency room was a deviation from the standard of care. Dr. Glenn Hamilton, a board-certified emergency medicine physician, testified that, given Aguilera's presenting signs and symptoms, an immediate CT scan should have been performed. This would have permitted the medical or surgical intervention that, in Dr. Hamilton's opinion, may have saved Aguilera's life. The following colloquy then occurred between plaintiff's attorney and Dr. Hamilton:

"Q. In your opinion, Doctor, again to a reasonable degree of medical certainty, had that delay been avoided, would Mr. Aguilera survive?

A. My opinion is that he would.

* * *

[A]t that point his chance of survival, if appropriately diagnosed, is greater than fifty percent.

* * *

Q. Do you believe the delay is directly related to his death?

A. I think the two are definitely related."

On cross-examination Hamilton testified that, assuming a prompt CT scan, he would have deferred to a neurosurgeon to decide whether surgical intervention was appropriate. Hamilton testified that if a neurosurgeon had concluded the bleed was inoperable, "there [was] the potential of shifting to medical therapy." But he testified that he knew of no medical treatment that would stop a bleed or prevent a bleed from restarting.

Plaintiff's second expert, Dr. Dragomir Vuckovich, a board-certified neurologist, testified that it was critical that the CT scan be performed early, not only to permit effective treatment of the patient, but to determine the precise location and size of the hemorrhage while still treatable. In his opinion the CT scan of Aguilera, taken six

to seven hours after he entered the emergency room, showed an inoperable hemorrhage. But it was significant, in Vuckovich's opinion, that Aguilera arrived at the emergency room conscious and alert and remained so for several hours. This showed that there had not yet been involvement of the brain stem. Vuckovich concluded, based on Aguilera's clinical signs, that if a CT scan had been performed earlier it would have shown a small bleed in the thalamus. Until Aguilera suffered seizures shortly after 8 a.m., he had no clinical signs of severe brain involvement and his level of consciousness and vital signs were encouraging factors. Vuckovich was then asked his opinion about Aguilera's chance of survival if he had been given prompt treatment. Vuckovich answered:

> "At his age at the clinical course that he displayed from 3:20 a.m. until 9 o'clock, I believe his survival, it would have been in the region of 75, 80 percent."

In explaining the reason for this opinion, Vuckovich relied mostly on studies of and personal experience with patients with thalamic bleeds who were successfully treated through neurosurgery. On cross-examination, Vuckovich said he would consult and seriously consider, if not defer to, a neurosurgeon's opinion about whether surgical intervention would have been appropriate following an earlier CT scan. He did not know what a neurosurgeon would have done if called after an earlier CT scan. When asked whether neurosurgery is "a modality for treatment of a thalamic stroke or thalamic bleed," Vuckovich initially responded "at times, yes." But he then reaffirmed his deposition testimony that neurosurgery is "[n]ot an ideal" modality for thalamic bleeds.

In granting judgment notwithstanding the verdict, the trial court reasoned that even if defendants deviated from the standard of care in failing to order an earlier CT scan, plaintiff failed to offer evidence that this negligence was the proximate cause of plaintiff's injury. Plaintiff argues on appeal that the trial court erred by: (1) allowing use of the CT scan at trial and disallowing evidence challenging the CT scan's reliability; and (2) finding that her experts' testimony was insufficient to establish proximate cause.

We first address an evidentiary issue raised by plaintiff. She suggests that the CT scan films on which her experts relied were "irreparably tainted." She argues that the trial court erred by allowing use of the films at trial and not allowing plaintiff to argue that the films may have been those of another patient. Plaintiff concludes that, without the CT scan, Aguilera's condition was less certain and "the list of [possible] conditions [included some] which were *** more susceptible to successful treatment."

Before trial, plaintiff moved to bar use of the CT scan films. Plaintiff argued that although Aguilera's name and patient number were typewritten on the films, the typewritten date on the films was April 18, 1987, the day before Aguilera went to the hospital. The date April 19, 1987, was handwritten on the films.

The trial judge denied plaintiff's motion. He gave several reasons that established the reliability of the films. He noted that the films had Aguilera's name and patient number on them; that other hospital records showed that the films were Aguilera's; that family members testified that Aguilera was in the department of radiology at the same time the log showed the CT scan was taken; and that plaintiff's expert witness agreed that Aguilera's symptoms were consistent with the condition shown on the films. The trial court also granted defendants' motion to bar plaintiff from arguing that the CT scans were not Aguilera's. He explained that the argument, based only on the altered date, would be unfairly prejudicial.

■■ Admission of evidence is within the sound discretion of the trial court, and a ruling will not be reversed absent a clear showing of abuse of that discretion. *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 159 Ill. 2d 137, 169, 636 N.E.2d 503 (1994). We note that plaintiff cites no legal authority to support this claim of error as required under Illinois Supreme Court Rule 341. 155 Ill. 2d R. 341(e)(7). See *Estate of Strocchia v. City of Chicago*, 284 Ill. App. 3d 891, 672 N.E.2d 914 (1996). We also note that plaintiff does not cite to where in the record we may find the documents on which she based her motion *in limine*: the hospital records and a supporting deposition. Based on our review of the record, these documents were not included. The appellant must provide a sufficient record to support his claim of error. In the absence of a sufficient record we must presume the court's ruling was proper. *Edwards v. Atchison, Topeka & Santa Fe Ry. Co.*, 291 Ill. App. 3d 817, 821, 684 N.E.2d 919 (1997).

Even if we ignore the lack of a proper record, we believe the trial court's rulings were sound. In light of the reasons given by the trial court, the date discrepancy on the films had little tendency to establish that the films were not Aguilera's. We note that plaintiff was not prohibited from questioning witnesses about the alteration of the dates for other purposes—to show inadequate record keeping, for example. The trial court did not abuse its discretion.

■ We next address plaintiff's argument that her experts' testimony was sufficient to establish proximate cause. Whether there is a deviation from the standard of care and whether the deviation was a proximate cause are normally questions for the jury. *Borowski*

*v. Von Solbriq*, 60 Ill. 2d 418, 424, 328 N.E.2d 301 (1975). Judgment notwithstanding the verdict should be entered only when all the evidence, viewed in the light most favorable to the opponent of the motion, so overwhelmingly favors the movant that no contrary verdict based on that evidence could stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504 (1967). A motion for a judgment notwithstanding the verdict presents a question of law and will be granted only if there is a total failure or lack of evidence to prove an essential element of the plaintiff's case. *Merlo v. Public Service Co.*, 381 Ill. 300, 45 N.E.2d 665 (1942).

Plaintiff argues that the testimony of her experts is evidence of proximate cause. Plaintiff cites to *Northern Trust Co. v. Louis A. Weiss Memorial Hospital*, 143 Ill. App. 3d 479, 493 N.E.2d 6 (1986), *Chambers v. Rush-Presbyterian-St. Luke's Medical Center*, 155 Ill. App. 3d 458, 508 N.E.2d 426 (1987), and the Restatement (Second) of Torts section 323 (1965) for the proposition that a plaintiff demonstrates a proximate cause relationship if the patient lost an opportunity to survive because of a defendant's negligence.

Defendants argue in response that the testimony of plaintiff's experts failed to establish proximate cause under Illinois law. Plaintiff must establish that it is more probably true than not true that the negligence was a proximate cause of the injury. *Borowski*, 60 Ill. 2d at 424. Proximate cause in a malpractice case must be established by expert testimony to "a reasonable degree of medical certainty." *First National Bank v. Porter*, 114 Ill. App. 3d 1, 13, 448 N.E.2d 256 (1983).

Defendants argue that a CT scan is a diagnostic tool that cannot alleviate a condition. Plaintiff must prove not only that an earlier CT scan would have revealed the condition, but, under the appropriate standard of care, the diagnosis would have triggered medical or surgical intervention to prevent the decedent's death.

In our original opinion, we noted that plaintiff did not argue a "lost chance" theory, but that even if she had done so we believed Illinois law did not recognize this as a cause of action under which plaintiff could recover. Although Illinois courts had been inconsistent in their applications of the "lost chance" doctrine, we believed *Hare v. Foster G. McGaw Hospital*, 192 Ill. App. 3d 1031, 549 N.E.2d 778 (1989), reflected Illinois law on the matter. *Holton* overruled *Hare*. But in doing so, the court stressed that the rejection of *Hare* was based on the *Hare* holding that a "lost chance" theory could not be harmonized under any circumstances with traditional notions of proximate cause. The *Holton* court noted that "the specific disposition[ ] *** in *Hare* *** may have been justified," and overruled *Hare*

"to the extent that [its] analysis conflicts with our holding in the instant case." *Holton*, 176 Ill. 2d at 118-19.

■ Holton held that the "lost chance" doctrine is not a separate theory of recovery in Illinois, but is a concept that enters into the proximate cause analysis in medical malpractice cases where a plaintiff alleges a defendant's " 'negligent delay in diagnosis or treatment *** lessened the effectiveness of treatment.' " *Holton*, 176 Ill. 2d at 115, quoting *Northern Trust Co. v. Louis A. Weiss Memorial Hospital*, 143 Ill. App. 3d 479, 487 (1986). In *Holton*, the trial court denied defendant's motion for judgment notwithstanding the verdict. The evidence at trial revealed that the plaintiff went to the hospital complaining of numbness below the waist and tingling in her leg. She was admitted to the hospital. The next day she noticed increasing difficulty in moving her leg, which she reported to attending nurses and nurses aides. They did not, in turn, report her changes of condition to a doctor. The neurosurgeon on call testified—and this is critical to the resolution in *Holton* and the case before us—*that if he had been notified of the plaintiff's change of condition, he would have come to the hospital immediately and would have had enough time to properly diagnose and ease the pressure on the spinal cord.* Our supreme court agreed with the trial court's decision that the evidence supported the jury's verdict on the issue of proximate cause because the record supported "the inference that defendant's negligent acts and omissions prevented [plaintiff's] physicians from correctly diagnosing and treating her condition." *Holton*, 176 Ill. 2d at 110.

Our supreme court addressed the disagreement among Illinois courts about whether the loss-of-chance doctrine relaxes the traditional proximate cause standard in medical malpractice cases or whether traditional principles of proximate cause are satisfied by and can be harmonized with the loss-of-chance concept. The court agreed with cases finding the latter. See *Holton*, 176 Ill. 2d at 113-18, citing *Hajian v. Holy Family Hospital*, 273 Ill. App. 3d 932, 652 N.E.2d 1132 (1995); *Pumala v. Sipos*, 163 Ill. App. 3d 1093, 517 N.E.2d 295 (1987); *Chambers*, 155 Ill. App. 3d 458; *Northern Trust Co.*, 143 Ill. App. 3d 479. The court quoted with approval section 323 of the Restatement (Second) of Torts (1965), which provides that " '[o]ne who undertakes *** to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm ***.' " *Holton*, 176 Ill. 2d at 114-15, quoting Restatement (Second) of Torts § 323 (1965). The court concluded:

"To the extent a plaintiff's chance of recovery or survival is lessened by the malpractice, he or she should be able to present evidence to a jury that the defendant's malpractice, to a reasonable degree of medical certainty, proximately caused the increased risk of harm or lost chance of recovery." *Holton*, 176 Ill. 2d at 119.

■ Here defendants argue that, under *Holton*, a directed verdict remains proper in a wrongful death suit where the evidence reveals that no medical treatment was available for the decedent's fatal illness. We agree. Unlike the plaintiff in *Holton*, the record before us contains no evidence to support the opinion of plaintiff's experts that the negligent delay in administering a CT scan lessened the effectiveness of treatment.

The supreme court in *Holton* approved of the proximate cause analysis in *Pumala*, 163 Ill. App. 3d 1093, 517 N.E.2d 1093. In *Pumala*, the court said: "Plaintiff must present evidence which shows with a reasonable degree of medical certainty that a negligent delay in diagnosis or treatment *lessened the effectiveness of treatment* ***.*" (Emphasis added.) *Pumala*, 163 Ill. App. 3d at 1098. The plaintiff argued that the defendant's misdiagnosis of a tumor in her leg caused the amputation of her leg several years later. The *Pumala* court noted that no expert testified to a reasonable degree of medical certainty that an alternative treatment could have been given that would have negated the need for amputation. The court upheld a directed verdict because the plaintiff had not shown that defendant's negligence lessened the effectiveness of her treatment. *Pumala*, 163 Ill. App. 3d at 1099.

Similarly, defendants here argue that no evidence was offered that an earlier CT scan and diagnosis of the small thalamic bleed would have led to treatment to prevent or lessen the second massive bleed that caused Aguilera's death. An expert may give an opinion without disclosing the facts underlying it. *Wilson v. Clark*, 84 Ill. 2d 186, 194, 399 N.E.2d 651 (1981). The burden then shifts to the adverse party on cross-examination to elicit the facts that underpin the expert's view. *Wilson*, 84 Ill. 2d at 194. An expert opinion is only as valid as the reasons for the opinion. When there is no factual support for an expert's conclusions, the conclusions alone do not create a question of fact. *Gyllin v. College Croft Enterprises, Ltd.*, 260 Ill. App. 3d 707, 715, 633 N.E.2d 111 (1994).

On cross-examination, defendants elicited testimony from plaintiff's experts showing that their conclusion that delay in ordering a CT scan was a proximate cause of decedent's death was not supported by the facts. Vuckovich testified that he did not know if surgical intervention should have been ordered if a prompt CT scan had

been administered. Both experts said that the decision of whether neurosurgery should be performed would not have been made without input from a neurosurgeon. Hamilton said he would defer to a neurosurgeon's opinion. Vuckovich said he would consult a neurosurgeon and seriously consider, if not defer to, the neurosurgeon's opinion. But the only two neurosurgeons who testified agreed with the treating neurologist that, even with an earlier CT scan, surgery would not have been appropriate or ordered because the bleed was deep within the brain inside the thalamus. Without supporting testimony from a neurosurgeon, plaintiff's experts' testimony was insufficient to show that neurosurgery, much less effective neurosurgery, should have occurred absent defendants' negligence. In contrast, the critical evidence in *Holton* was offered by the treating physician, who testified that had he been informed of the patient's symptoms earlier he would have intervened with treatment to lessen the chance of paralysis.

The record does reveal that certain medications were available as an alternative to surgery. But defense expert Dr. Kari Stefansson testified that failure to administer these medications would not have been a deviation from the standard of care. This opinion was not controverted. Neither of plaintiff's experts testified that medicine should have been administered following an earlier CT scan or that the failure to administer the medicine would have been a deviation from the standard of care. No expert testified that medication would have lessened the injury that caused plaintiff's death—the second hemorrhage. Hamilton testified that he knew of no medication that would have prevented the second hemorrhage or stopped the bleeding once it began.

The reasons for plaintiff's experts' opinions on proximate cause, as developed during direct and cross-examinations, failed to establish a predicate for their opinions about proximate cause. The absence of expert testimony that, under the appropriate standard of care, an analysis of an earlier CT scan would have led to surgical intervention or other treatment that may have contributed to the decedent's recovery creates a gap in the evidence of proximate cause fatal to plaintiff's case. See *Gill v. Foster*, 157 Ill. 2d 304 (1993) (hospital not liable where treating physician testified that nurse's failure to notify him of patient's condition did not affect the doctor's treatment of the patient). Plaintiff failed to offer evidence to a reasonable degree of medical certainty that the alleged negligent delay in administering a CT scan lessened the effectiveness of the medical treatment given to Aguilera. This is the test formulated in *Northern Trust* (143 Ill. App. 3d at 487) and endorsed in *Holton* (176 Ill. 2d at 115). As *Holton* holds, the test harmonizes the apparent conflict between the "lost

chance" concept and traditional notions of proximate cause without diminishing the vitality of the latter. Without such evidence, the opinions offered by the plaintiff's experts in the case before us must be viewed as conjecture. A directed verdict for the defendant is proper when the causal connection between treatment, or a delay in treatment, and the claimed injury is "contingent, speculative or merely possible." *Pumala*, 163 Ill. App. 3d at 1099.

Affirmed.

THEIS and O'BRIEN, JJ., concur.