2025 IL App (1st) 240203

FOURTH DIVISION
Order filed: January 16, 2025

No. 1-24-0203

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| JOSE RAMIREZ, Independent Administrator of the Estate of Ebeilda Ramirez, Decedent, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 21 L 9652 |
| HOLLY CAROBENE, M.D., and COMPREHENSIVE PAIN CARE, | ) ) ) ) | Honorable John H. Ehrlich, |
| Defendants-Appellants. | ) ) | Judge, presiding. |

JUSTICE HOFFMAN delivered the judgment of the court, with opinion.
Justices Lyle and Ocasio concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial, Dr. Holly Carobene and Comprehensive Pain Care (together, "Defendants") appeal a judgment entered in favor of Jose Ramirez, as Independent Administrator of the Estate of Ebeilda Ramirez ("the Estate"). The Defendants contend that the trial court erred in denying their motion for judgment notwithstanding the verdict (JNOV), in which they argued that the evidence did not establish that Dr. Carobene's actions were the proximate cause of Ebeilda

Ramirez's death, and they also assert that the assessment of prejudgment interest was unconstitutional. We see no merit to their arguments and affirm the circuit court's judgment.

¶ 2  In September 2021, the Estate filed a two-count wrongful-death and personal-injury complaint against the Defendants alleging that Ramirez had died of respiratory failure caused by Dr. Carobene carelessly prescribing narcotic medication to her despite signs of drug abuse and drug-seeking behavior. The Defendants answered the complaint and the case proceeded to trial.

¶ 3  The evidence presented at trial generally established that Ramirez suffered a work-related injury in 2006 when she was 32 years old. She experienced pain in her neck and lower back and over the next several years was treated with surgical procedures, epidural injections, nerve block injections, and narcotic pain medication. Ramirez also suffered from additional maladies, including generalized anxiety disorder, irritable bowel syndrome (IBS), panic disorder, depression, asthma, mitral valve prolapse, and intussusception, for which she was prescribed a variety of medications. In 2010, she began complaining of severe abdominal pain, for which Dr. Lloyd Blakeman prescribed the narcotic hydrocodone, and he continued to prescribe hydrocodone for her into 2011. Dr. Blakeman eventually stopped authorizing refills of Ramirez's hydrocodone prescription without an office visit, but Ramirez never came back to see him.

¶ 4  Ramirez then began seeing Dr. Carobene on June 21, 2011, complaining of neck and back pain. At that time, she was taking hydrocodone three times per day. Dr. Carobene prescribed hydrocodone for Ramirez at her first appointment and did so without checking the Illinois Prescription Monitoring Program (PMP), which is an electronic database that collects, tracks, and stores reported dispensing data on controlled substances, including hydrocodone. The PMP allows a physician to look up a patient's history of prescriptions for controlled substances. At her first

appointment with Dr. Carobene, Ramirez signed a contract that: warned her that controlled substances, including narcotics, have a high potential for misuse; stated that medication that is lost, misplaced, stolen, or used up too quickly will not be replaced; required her to agree that she would not request or accept a controlled substance medication from another physician while receiving that medication from Dr. Carobene; and informed her that Dr. Carobene may determine that she needs to see a medication use specialist, who may recommend that the prescription not be continued.

¶ 5    Two days after Ramirez's first appointment with her, Dr. Carobene conducted a PMP search, which revealed that Ramirez had been receiving prescriptions for pain medicine from other providers. When Dr. Carobene's office called Ramirez, she informed them that she had recently had a root canal and been prescribed a narcotic for pain. The PMP also revealed Ramirez's prescriptions from Dr. Blakeman, the latest of which was on May 4, 2011, as well as a hydrocodone prescription from Dr. Leslie Michaud, which was on May 23, 2011.

¶ 6    Dr. Carobene continued to prescribe hydrocodone to Ramirez from 2011 until her death in 2015. During the course of their relationship, Ramirez reported to Dr. Carobene on several occasions that she had either finished her prescription early or lost her pills, and several times her urine tests revealed that she was negative for hydrocodone, indicating that she had not taken a hydrocodone pill within the last one-and-a-half to two days and had finished her prescription early.

¶ 7    Specifically, on August 16, 2011, Ramirez appeared in Dr. Carobene's office for a follow-up after a laparoscopic procedure in her abdomen. At that visit, Ramirez's urine screen was negative for hydrocodone and Ramirez reported that she had taken her last dose of medication two

days earlier. Dr. Carobene increased Ramirez's hydrocodone prescription following that appointment.

¶ 8    On December 29, 2011, Ramirez again appeared in Dr. Carobene's office and falsely told Dr. Carobene that she had left her medication in Mexico and needed a refill. A PMP search conducted by Dr. Carobene's office shortly after this visit revealed that Ramirez had been prescribed hydrocodone by two other physicians in June and July of 2011.

¶ 9    Ramirez requested and received another refill of her hydrocodone prescription from Dr. Carobene on January 26, 2012. Dr. Carobene's office performed another PMP search after this visit, which revealed that Ramirez had received another narcotic, Ativan, from another physician in December 2011. On May 29, 2012, Ramirez again appeared at Dr. Carobene's office for an appointment, during which her urine screen again came back negative and she reported that she had finished her prescription early. On November 16, 2012, Ramirez contacted Dr. Carobene's office, falsely told them that her husband had thrown out her hydrocodone, and requested an early refill of the prescription. Dr. Carobene's office "reinforce[d]" the controlled substances contract and Dr. Carobene authorized the refill.

¶ 10   Over the course of 2013-2015, abdominal issues affected Ramirez's ability to eat and caused her to lose approximately 25 pounds, which required that an intravenous catheter ("PICC line") be installed in March 2015 to allow her to inject nutrients intravenously. On June 23, 2015, Ramirez complained of chest pain, and 15 minutes later she was found unresponsive. She was pronounced dead upon arrival at the hospital.

¶ 11    The parties each presented expert testimony concerning Ramirez's cause of death, her possible addiction to narcotics, the nature of her abdominal complaints, and whether Dr. Carobene violated the standard of care in her treatment of Ramirez.

¶ 12    Dr. Kristin Escobar Alvarenga testified that she is a pathologist for the Cook County Medical Examiner's Office and performed Ramirez's autopsy. As part of the autopsy, Dr. Escobar examined Ramirez's lung tissue as well as toxicology reports detailing the presence of drugs in Ramirez's system at the time of death. Dr. Escobar observed several notable conditions, including acute hydrocodone toxicity, "foreign body multinucleated giant cell reaction with polarized foreign material in the lungs," pulmonary congestion, and non-nutrition. Her opinion was that the cause of death was acute hydrocodone toxicity, which she explained as a sufficient concentration of hydrocodone in Ramirez's blood to cause death. Specifically, Dr. Escobar testified that Ramirez had a hydrocodone serum level of 0.18 micrograms per milliliter (μg/ml) and that, depending on the textbook that you refer to, anything above 0.10 μg/ml can be considered toxic or lethal. However, Dr. Escobar acknowledged that in her deposition she had stated that 0.20 μg/ml is the toxic level for hydrocodone. Dr. Escobar also agreed that the decedent's history of drug use and resulting level of tolerance is a relevant consideration when determining the cause of death, and she admitted that, at the time that she decided Ramirez's cause of death, she was unaware that Ramirez had been taking hydrocodone for several years.

¶ 13    Dr. Escobar testified that someone suffering from hydrocodone toxicity would typically experience central nervous system depression and become obtunded, meaning that they would have difficulty breathing, have slow respiration, and be drowsy or only semi-awake. Without intervention, the person will eventually stop breathing and enter cardiac arrest. According to her

review of Ramirez's medical records, Dr. Escobar testified that on the day of her death Ramirez did not show any signs of central nervous system depression and did not become obtunded.

¶ 14 Dr. Escobar explained that the observation of "foreign body multinucleated giant cell reaction with polarized foreign material in the lungs" refers to foreign material in the lung tissue to which the body has reacted and attempted to remove. Its presence is consistent with and can be explained by a person grinding up medication and injecting it. Dr. Escobar agreed that, regardless of the toxic effects of the drug, foreign material in the lungs can result in chest pain, difficulty breathing, and ultimately death. Dr. Escobar also agreed that the symptoms that Ramirez exhibited in three hospitalizations in the months before her death, which included chest pain, difficulty breathing, fever, chills, and cough, were consistent with Ramirez grinding and injecting her medication into her PICC line.

¶ 15 Dr. Stephen Cina, an anatomical and forensic pathologist who served as Cook County's chief medical examiner and acted as Dr. Escobar's supervisor at the time of Ramirez's death, testified that he agreed with Dr. Escobar's conclusion that Ramirez died of acute hydrocodone toxicity, and, like Dr. Escobar, he testified that Ramirez's hydrocodone serum level of 0.18 μg/ml was within the lethal range. Dr. Cina agreed that the presence of foreign material in Ramirez's lungs was consistent with crushed pills being injected into her PICC line. Dr. Cina explained that a medication that is injected into the bloodstream will be absorbed more quickly and produce a faster reaction. However, the fillers in the pill that would normally be dissolved in the digestive system when the pills are taken orally are not dissolved in the blood and eventually travel to the lungs, where they get trapped, producing an inflammatory response. Dr. Cina also testified that the internal autopsy examination revealed that Ramirez had adhesions in her abdomen. When asked

why he believed that Ramirez died from acute hydrocodone toxicity, rather than from the foreign material in her lungs, Dr. Cina explained:

"Well, what was going on in her lungs, this inflammatory process with giant cells and deposition of all this material, that's been going on for weeks, months, potentially even years if she has been doing it longer. This is a chronic process.

So she was alive with those lungs the day before she had this lethal hydrocodone level. She was alive with these lungs a week before she had this lethal hydrocodone level or even a month before she had this lethal hydrocodone level.

So if she didn't die at any of those times but just happened to die when she had a lethal drug concentration on board, I'm going to go with the lethal drug concentration that killed her."

¶ 16   Dr. Andrew Engel testified for the Estate as an expert on pain management. Dr. Engel opined that Dr. Carobene violated the standard of care in multiple ways: by prescribing hydrocodone to Ramirez in June 2011 when there was clear evidence that Ramirez had been doctor shopping and potentially misusing her medications; by not contacting the other doctors on the PMP who were prescribing hydrocodone to Ramirez; by not referring Ramirez to a psychiatric addiction specialist; by not transitioning Ramirez from hydrocodone to buprenorphine in light of her severe abdominal pain, which he believed was narcotic bowel syndrome; and by continuing to prescribe hydrocodone to Ramirez despite Ramirez not seeing any improvements in her level of pain.

¶ 17   Dr. Engel explained that Ramirez showed "all of the red flags" suggesting abuse, misuse, and addiction by doctor shopping, running out of medication early, and failing urine screens, which demonstrated that she was taking her medication too quickly. He opined that these red flags of

misuse should have prompted Dr. Carobene to investigate Ramirez's hydrocodone usage and transition Ramirez from hydrocodone to buprenorphine. Ultimately, Dr. Engel opined that Dr. Carobene's violations of the standard of care caused Ramirez's death and that, had Dr. Carobene not prescribed hydrocodone to her, Ramirez would not have died.

¶ 18  On cross-examination, Dr. Engel agreed that Ramirez had told her primary care physician and gastroenterologist about her abdominal pain but that Dr. Carobene was not made aware of that pain until May 2015. Dr. Engel also admitted that, as a pain management specialist, Dr. Carobene would not have been responsible for treating Ramirez's gastrointestinal issues.

¶ 19  Dr. Wajahat Mehal testified as the Estate's expert gastroenterologist. He concluded that Ramirez had developed narcotic bowel syndrome and that Ramirez's symptoms would have allowed for a diagnosis of that condition by 2012. He based this conclusion on Ramirez having satisfied several criteria, including that she had been taking narcotics for several years, that her abdominal pain had not improved with the use of narcotics, that there was a worsening of the pain when Ramirez used narcotics at a low level, and that there were no other adequate explanations for the pain. Regarding the other possible explanations for Ramirez's abdominal pain, Dr. Mehal testified that IBS would not have led to her severe weight loss and malnourishment; that intussusception is usually an acute and or short-lived condition, rather than the type of chronic condition that Ramirez was experiencing; and that radiological imaging did not show the type of bowel blockage that would normally accompany adhesions. Dr. Mehal ultimately opined that, had her narcotic bowel syndrome been diagnosed and treated with a gradual reduction and eventual cessation of opioid use, Ramirez would not have died.

¶ 20 Dr. Olivera Bogunovic-Sotelo testified as the Estate's addiction psychiatry expert. She opined that, by January 2012, if she had been referred to a medication use specialist or addictionologist, Ramirez would have been diagnosed with opiate use disorder, which is equivalent to addiction. She based this conclusion on Ramirez's doctor shopping and reporting of lost medication. Dr. Bogunovic-Sotelo explained that the treatment for Ramirez's addiction would have involved the use of alternative medication, as well as therapy and counseling.

¶ 21 The Defendants' forensic pathology expert, Dr. Andrew Baker, opined that Ramirez died from complications resulting from injecting crushed pills into her venous system, and not from acute hydrocodone toxicity. He believed that Ramirez's hydrocodone serum level did not contribute to her death in any way. He explained that drug toxicity is a diagnosis of exclusion that requires that other potential causes of death be first ruled out, and in this case the condition of Ramirez's lungs trumped the equivocal postmortem hydrocodone serum level.

¶ 22 Dr. Jay Joshi testified as the Defendants' anesthesiology and interventional pain management expert. He disagreed with Dr. Engle's conclusions that Dr. Carobene deviated from the standard of care by prescribing hydrocodone to Ramirez at her first visit and in continuing to prescribe it during the course of her care, as he believed that there was evidence that the hydrocodone was improving Ramirez's condition. He also opined that there was no evidence from which Dr. Carobene should have been able to diagnose narcotic bowel syndrome. Like Dr. Baker, Dr. Joshi believed that Ramirez died from embolized particulates in her lungs. He based that conclusion on Ramirez being an opioid-tolerant patient who was on a lower dose of medication than she had been in years prior, that she had been able to tolerate higher doses before, that her hydrocodone serum level was not indicative of someone who had taken an excessive amount of

medication, and that her symptoms immediately before her death were more consistent with someone suffering from complications of particulates in her lungs.

¶ 23    Dr. Joshi also opined that Ramirez's doctor shopping, negative urine screens, and reports of lost medications did not support a diagnosis of opiate use disorder and did not require Dr. Carobene to cease prescribing Ramirez with hydrocodone. According to Dr. Joshi, Ramirez's daily dosage of 30-40mg of hydrocodone per day was "very conservative" and well below the 100mg threshold for being a questionable dosage.

¶ 24    The Defendants' gastroenterology expert, Dr. Michael Frank, testified that Ramirez did not have narcotic bowel syndrome. He explained that the hallmark feature of narcotic bowel syndrome is unexplained abdominal pain that does not improve with increasing doses of narcotics but does improve with a decrease in dosage. According to Dr. Frank, Ramirez's medical records did not indicate that her increases and decreases in abdominal pain were correlated with or connected to her narcotics dosages in the manner that it should have been if she had narcotic bowel syndrome.

¶ 25    At the conclusion of trial, the jury returned a general verdict in favor of the Estate, finding the Defendants liable for total damages in the sum of $6 million. On motion of the Estate, the circuit court modified the judgment to assess an additional $647,999 in prejudgment interest. The Defendants then filed a post-trial motion for judgment notwithstanding the verdict (JNOV) arguing that the evidence failed to establish a *prima facie* case of proximate causation because the Estate's expert testimony relied on speculation and did not establish that Ramirez's death was reasonably foreseeable.

¶ 26    The circuit court denied the Defendants' motion, finding that there was sufficient evidence from which the jury could have found that the Estate established proximate causation. Specifically,

the court stated that, as to cause in fact, based on Ramirez's red-flag conduct, "the jury could have reasonably found that, but for Carobene prescribing and ultimately increasing Ramirez's prescription for hydrocodone, Ramirez would not have become addicted and would not have eventually crushed her medication and injected it into her PICC line." Regarding legal cause, the court observed that, for the same reason, *i.e.* Ramirez's red-flag conduct, "there was sufficient evidence for the jury to conclude that Ramirez's death was not so extraordinary a result that Carobene could not be found liable." This appeal follows.

¶ 27   The Defendants raise three issues on appeal. First, they contend that the circuit court erred in denying their motion for JNOV because the Estate's expert testimony that Dr. Carobene's actions caused Ramirez's death required speculation that Ramirez would not have obtained narcotics from another source or injected alternative medications and failed to demonstrate that it was reasonably foreseeable that Ramirez would inject her medication through her PICC line. Second, they assert that, for essentially the same reasons, the jury's verdict was against the manifest weight of the evidence. Third, the Defendants argue that the prejudgment interest statute ("PJI statute") (735 ILCS 5/2-1303(c) (West 2022)) is unconstitutional. We see no merit to the first issue, and the second and third issues we find to have been forfeited.

¶ 28   The Defendants' first issue concerns the sufficiency of the evidence and the circuit court's denial of their motion for JNOV. "To succeed on a medical malpractice claim, the plaintiff must prove (i) the standard of care a medical provider should have followed, (ii) the defendant failed to meet the standard of care, and (iii) the plaintiff's injuries were proximately caused by the defendant's failure to meet the standard of care." *Guerra v. Advanced Pain Centers S.C.*, 2018 IL

App (1st) 171857, ¶ 30 (citing *Johnson v. Loyola University Medical Center*, 384 Ill. App. 3d 115, 121 (2008)). At issue in this appeal is the third element of proximate causation.

¶ 29   "The term 'proximate cause' encompasses two distinct requirements: cause in fact and legal cause." *Young v. Bryco Arms*, 213 Ill. 2d 433, 446 (2004) (citing *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 455 (1992)). "The first requirement, cause in fact, is present 'when there is a reasonable certainty that a defendant's acts caused the injury or damage.' " *Id.* (quoting *Lee*, 152 Ill. 2d at 455). "In deciding this question, we first ask whether the injury would have occurred absent the defendant's conduct." *Id.* (citing *Lee*, 152 Ill. 2d at 455). "The second requirement, legal cause, is established only if the defendant's conduct is 'so closely tied to the plaintiff's injury that he should be held legally responsible for it.' " *Id.* (quoting *Simmons v. Garces*, 198 Ill. 2d 541, 558 (2002)). "The proper inquiry regarding legal cause involves an assessment of foreseeability, in which we ask whether the injury is of a type that a reasonable person would see as a likely result of his conduct." *Id.* at 446-47 (citing *Lee*, 152 Ill. 2d at 456). "Proximate cause in a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible." *Ayala v. Murad*, 367 Ill. App. 3d 591, 601 (2006).

¶ 30   "A motion for JNOV should be granted only when the evidence and inferences therefrom, viewed in the light most favorable to the nonmoving party, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand." *Ries v. City of Chicago*, 242 Ill. 2d 205, 215 (2011) (citing *Maple v. Gustafson,* 151 Ill. 2d 445, 453 (1992)). "The court has no right to enter a judgment *n.o.v.* if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of

credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." *Maple*, 151 Ill. 2d at 454. "A decision on a motion for JNOV is reviewed *de novo*." *Ries*, 242 Ill. 2d at 215 (citing *Snelson v. Kamm*, 204 Ill. 2d 1, 42 (2003)).

¶ 31 The Defendants argue on appeal, as they did in their motion for JNOV, that the Estate failed to prove both elements of proximate causation. We will start with cause in fact. On that point, the Defendants contend that the Estate's expert opinions were insufficient to support a finding that Dr. Carobene's actions were the cause in fact of Ramirez's death because the opinions impermissibly relied on speculation that, had Dr. Carobene ceased prescribing hydrocodone to her, Ramirez would not have obtained the drugs that killed her from another source or injected another medication in a similar manner.

¶ 32 For support, the Defendants rely on two cases, *Aguilera v. Mount Sinai Hospital Medical Center*, 293 Ill. App. 3d 967 (1997), and *Pumala v. Sipos*, 163 Ill. App. 3d 1093 (1987). In *Aguilera*, the decedent presented in the emergency room complaining of numbness on the left side of his body. 293 Ill. App. 3d at 968. A CT scan taken several hours later showed that the decedent had a large intracerebral hemorrhage. *Id.* at 969. The decedent lapsed into a coma later that day and died three days thereafter. *Id.* At trial, the decedent's estate presented expert testimony opining that the failure of the emergency room physician to order a CT scan earlier deviated from the standard of care and that the decedent would have survived if the delay had been avoided. *Id.* However, on cross-examination, both of the estate's experts testified that, following the CT scan, they would have consulted with and likely deferred to a neurosurgeon regarding whether surgical intervention would have been appropriate. *Id.* at 969-70. The trial court granted the defendants'

motion for JNOV on the grounds that the estate's expert testimony failed to establish proximate causation. *Id.* at 970.

¶ 33    On appeal, the appellate court agreed with the trial court and affirmed. *Id.* at 976. In doing so, the court explained that the testimony of the estate's experts amounted to conjecture and failed to prove that the delay in administering the CT scan proximately caused the decedent's death because both experts admitted that they would have deferred to a neurosurgeon regarding the appropriateness of surgical intervention and both of the neurosurgery experts who testified at trial opined that, even with an earlier CT scan, surgery would not have been appropriate or ordered. *Id.* at 974-75. The court concluded that the "absence of expert testimony that, under the appropriate standard of care, an analysis of an earlier CT scan would have led to surgical intervention or other treatment that may have contributed to the decedent's recovery creates a gap in the evidence of proximate cause fatal to plaintiff's case." *Id.* at 975.

¶ 34    In *Pumala*, the plaintiff's family physician misdiagnosed her knee pain as a benign osteochondroma. 163 Ill. App. 3d at 1095. When it was discovered several years later to be a malignant osteosarcoma, a portion of the plaintiff's leg had to be amputated. *Id.* at 1096. The plaintiff sued the family physician on the theory that a correct initial diagnosis and a referral to the appropriate specialist could have avoided the amputation. *Id.* at 1095. At trial, the plaintiff's expert witnesses could only speculate as to whether an earlier diagnosis could have yielded a better result, with one expert testifying that "it's possible" that a less-severe procedure could have been performed and the other admitting that no one could say at what point the tumor was curable by means other than amputation. *Id.* at 1099. The trial court granted a motion for directed verdict on the basis that the patient failed to present sufficient evidence establishing that an early diagnosis

could have avoided amputation and that the defendant physician, therefore, proximately caused the patient's injury. *Id.* at 1097. On appeal, the appellate court affirmed, concluding that, due to the uncertainty and speculation in the opinions of the plaintiff's experts, the plaintiff had "not presented evidence that shows with a reasonable degree of medical certainty that defendant's alleged negligence lessened the effectiveness of her treatment." *Id.* at 1099.

¶ 35    Relying on these cases, the Defendants assert that the Estate "did not present evidence that Ms. Ramirez would not have crushed pills and injected them into her PICC line had Dr. Carobene referred Ms. Ramirez to an addiction specialist, terminated Ms. Ramirez's hydrocodone prescription, or diagnosed Ms. Ramirez with [narcotic] bowel syndrome." Specifically, the Defendants argue that, even if Ramirez had been transitioned from hydrocodone to buprenorphine, as Dr. Engel opined that she should have been, there was no testimony establishing that Ramirez would not have crushed and injected the buprenorphine, which Drs. Escobar and Cina acknowledged could have caused her death. Similarly, the Defendants argue that the Estate did not present testimony that, had Ramirez been weaned off of hydrocodone in 2012, Ramirez would not have accessed it from another source in 2015, given the evidence of her drug-seeking behavior.

¶ 36    However, the cases that the Defendants cite for support are distinguishable from the present case. In *Aguilera* and *Pumala*, the speculation or absence of evidence in the expert testimony concerned distinctly medical issues within the expertise of the plaintiffs' expert witnesses. In *Aguilera*, that was whether an early CT scan would have prompted lifesaving surgery, and in *Pumala* it was whether an earlier diagnosis would have prevented amputation or allowed for a less-severe treatment. Those were medical issues on which it was reasonable to expect a medical

expert to have an opinion, and the speculation that the experts were required to apply demonstrated a lack of requisite certainty on the issue of causation.

¶ 37    In the present case, the Defendants focus on the fact that the Estate's experts did not express opinions on what Ramirez may or may not have done had Dr. Carobene not prescribed her hydrocodone. That testimony regarding Ramirez's hypothetical conduct is not of the same character as the testimony at issue in *Aguilera* and *Pumala*. The Estate's experts testified to a reasonable degree of medical certainty that, had Dr. Carobene not prescribed hydrocodone to Ramirez, whether that be due to Ramirez's drug-seeking behavior, her evidence of addiction and abuse, or her possible narcotic bowel syndrome, then Ramirez would not have died. Contrary to the Defendants' claims, that testimony did not rely on any speculation.

¶ 38    Indeed, the cause-in-fact analysis looks at whether the plaintiff's harm would have resulted absent the defendant's conduct, and it is a simple fact that if Dr. Carobene had not been prescribing hydrocodone to Ramirez, for whatever reason, then Ramirez would not have had the hydrocodone that killed her. Asking whether Ramirez would have obtained hydrocodone from another source or would have injected another medication is not the relevant inquiry, and it is not reasonable to require the Estate's experts to exclude every other possible way that Ramirez could have died, particularly ones that involve issues of Ramirez's own agency. Accordingly, we believe that the Estate presented sufficient evidence that, absent Dr. Carobene's actions, Ramirez would not have died and that Dr. Carobene's conduct was, therefore, the cause in fact of Ramirez's death.

¶ 39    The second component of proximate causation is legal cause, which focuses on whether the plaintiff's alleged harm was a reasonably foreseeable and likely consequence of the defendant's actions. See *Young*, 213 Ill. 2d at 446-47. On this issue, the Defendants make three arguments,

asserting that Ramirez's death from misuse of her medication was not foreseeable because Dr. Carobene did not believe that Ramirez was addicted, Ramirez did not demonstrate any signs of narcotic bowel syndrome, which Dr. Carobene was not responsible for diagnosing and treating, and Ramirez's red-flag behavior in 2011 and 2012 did not make it foreseeable that she would misuse her medication several years later in 2015. None of these arguments have merit.

¶ 40   First, because we are reviewing the Defendants' motion for JNOV and, therefore, must view the evidence in a light most favorable to the Estate as the non-moving party, it does not matter that Dr. Carobene did not believe that Ramirez was addicted to hydrocodone. Rather, because the Estate presented expert testimony from Dr. Bogunovic-Sotelo that Ramirez demonstrated symptoms of opiate use disorder or addiction as early as January 2012, the jury could have found that Dr. Carobene should have known by 2012 that Ramirez was addicted to her medication.

¶ 41   Second, in a similar vein, it does not matter for the purposes of a motion for JNOV that the Defendants presented testimony that Ramirez did not have narcotic bowel syndrome since the Estate presented conflicting expert testimony from Drs. Mehal and Engel explaining that she did. And even though the Defendants argue that Dr. Carobene was not responsible for working up Ramirez's gastrointestinal issues, the Estate's pain management expert, Dr. Engel, testified that Dr. Carobene violated the standard of care by not diagnosing Ramirez's narcotic bowel syndrome and then discontinuing her hydrocodone prescription. As with the previous argument regarding Ramirez's addiction, the jury was entitled to disregard the testimony of the Defendants' experts and credit the contrary expert testimony put forth by the Estate.

¶ 42   Third, the passage of three years between Ramirez's red-flag behavior in 2011 and 2012 and her death from misuse of her medication in 2015 does not preclude Dr. Carobene's violations

of the standard of care from being the cause of Ramirez's death. Among the ways that the Estate alleged that Dr. Carobene violated the standard of care were by prescribing hydrocodone to Ramirez at the outset of their relationship despite her history of doctor shopping and by continuing to prescribe the drug to her in 2012 after Ramirez showed signs of misuse and addiction by obtaining narcotics from other providers, asking for early refills of prescriptions, and submitting negative urine screens. When we look at those particular allegations, we ask whether it was reasonably foreseeable that prescribing hydrocodone to a patient who exhibits signs of misuse and addiction might result in that patient misusing the drug in a lethal manner. The answer to that question is yes.

¶ 43    The Defendants focus on the particular detail of Ramirez injecting the hydrocodone into her PICC line and argue that such an act is not a likely result of Dr. Carobene prescribing the drug to Ramirez. But, once again, that argument is premised on a reading of the facts that is favorable to their position, and in the context of this motion for JNOV we must view the facts in a light most favorable to the Estate. Therefore, we must accept the Estate's evidence that Ramirez died from acute hydrocodone toxicity, rather than from consequences of foreign material in her lungs. With that being the case, the focus is not on whether it was foreseeable that a patient would inject her medication into a PICC line, but rather whether it was foreseeable when Dr. Carobene prescribed hydrocodone to Ramirez in 2011 and 2012 that a patient whose behavior raised, in Dr. Engel's words, "all of the red flags" suggesting abuse, misuse, and addiction would misuse her medication in any manner and succumb to hydrocodone toxicity. We think that a reasonable jury could find that it was, and that determination was for the jury to make. See *Kerns v. Hoppe*, 128 Nev. 910 (2012) ("A natural and logical consequence of continuing to provide highly addictive controlled

- 18 -

substances prescriptions to a patient that is suspected of being an addict is that the patient would abuse the drugs resulting in injury or death."); *Burroughs v. Magee*, 118 S.W.3d 323, 338 (Tenn. 2003) (Holder, J., concurring in part) (opining that it was reasonably foreseeable that a truck driver with a known history of drug abuse would misuse his medication and pose a danger to the public); see also *Mack v. Ford Motor Co.*, 283 Ill. App. 3d 52, 57 (1996) ("[W]here varying inferences are possible, foreseeability is a question for the jury."); *Smith v. Minier*, 2021-CA-01284-COA, 2023 WL 2381726, at *6 (Miss. Ct. App. Mar. 7, 2023), *aff'd*, 380 So. 3d 889 (Miss. 2024) (holding that the foreseeability of a patient's misuse of his medication was for the jury to determine).

¶ 44    Accordingly, the Estate presented sufficient evidence establishing that Dr. Carobene's violations of the standard of care were both the cause in fact and legal cause of Ramirez's death, and the circuit court, therefore, did not err in denying the Defendants' motion for JNOV on that issue.

¶ 45    In their second issue on appeal, the Defendants assert that the jury's verdict in the Estate's favor was against the manifest weight of the evidence. However, as the Estate points out in its brief, the Defendants did not raise this particular argument below. Indeed, in their posttrial motion the Defendants only argued for JNOV on the grounds that the evidence was insufficient to establish proximate cause, and they did not argue in any way that the verdict was against the manifest weight of the evidence, which is a distinctly different argument. See *Maple*, 151 Ill. 2d at 453. As a result, the Defendants have forfeited this issue. See Ill. S. Ct. R. 366(b)(2)(iii) (eff. Feb. 4, 1994) ("A party may not urge as error on review of the ruling on the party's post-trial motion any point, ground, or relief not specified in the motion."); *Benford v. Everett Commons, LLC*, 2014 IL App (1st) 130314, ¶ 42 ("Plaintiff did not raise her argument that the jury verdict was against the

manifest weight of the evidence in her posttrial motion. Accordingly, this argument is forfeited." (citing *Bakes v. St. Alexius Medical Center,* 2011 IL App (1st) 101646, ¶ 34)).

¶ 46 The Defendants' third issue concerns the constitutionality of the PJI statute, which provides for the assessment of prejudgment interest in personal injury and wrongful death cases. See 735 ILCS 5/2-1303(c) (West 2022). In particular, the Defendants contend that the PJI statute is unconstitutional because it (1) impairs the right to a trial by jury, (2) violates the principle of equal protection and the ban on special legislation, (3) intrudes on the judicial branch's exclusive power to administer justice according to the unique characteristics and circumstances of each case, (4) was passed by the legislature without proper compliance with the Three Readings Rule (Ill. Const. 1970, art. IV, § 8(d)), and (5) cannot be applied retroactively to a case that arose before the statute took effect.

¶ 47 However, three appellate court panels have issued decisions engaging in comprehensive analyses of these very same arguments, and all have found them to be without merit. See *Galich v. Advocate Health & Hospital Corp.*, 2024 IL App (1st) 230134, ¶¶ 57-85; *Cotton v. Coccaro*, 2023 IL App (1st) 220788, ¶¶ 40-70; *First Midwest Bank v. Rossi*, 2023 IL App (4th) 220643, ¶¶ 175-223. The Defendants in this appeal acknowledge those decisions but remind us that we are free to reach a different conclusion. However, in doing so, the Defendants do not engage in any analysis of the three decisions rejecting their arguments and they do not present an argument as to why those cases were wrongly decided. Instead, they devote barely more than a page of their brief to each alleged ground of unconstitutionality, essentially "cursory recantations of the exact arguments that were rejected" in the prior decisions, which this court found to be insufficient and a forfeiture of the argument in *Wilcox v. Advocate Condell Medical Center*, 2024 IL App (1st)

230355, ¶ 119 (finding that a defendant's argument that the PJI statute is unconstitutional was forfeited when it presented cursory arguments and "[made] no attempt in its brief to discuss [*Cotton* and *Rossi*] or to articulate any argument as to why their reasoning was flawed"). Because the Defendants' made such limited arguments and did not attempt to counter or address the prior decisions, we likewise find this issue to have forfeited. See *id.* And even if it were not forfeited, we are not persuaded by the Defendants' cursory assertion that the prior decisions were wrongly decided.

¶ 48    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 49    Affirmed.

No. 1-24-0203

Jose Ramirez v. Holly Carobene, M.D. and Comprehensive Pain Care
2024 IL App (1st) 240203

_____

Appeal from the Circuit Court of Cook County,
No. 21 L 9652, Honorable John H. Ehrlich, Judge Presiding

_____

Appellants Attorneys:        CUNNINGHAM, MEYER & VEDRINE, P.C.
                             Thomas A. Lang Hannah K. Wiens
                              1 East Wacker Suite 2200
                              Chicago, Illinois 60602
                              Phone: (312) 578-0049

                             DONOHUE BROWN MATHEWSON & SMYTH LLC
                             Scott L. Howie Jeffrey E. Eippert Charles W. Sprague
                             131 South Dearborn Street Suite 1600
                              Chicago, Illinois 60603
                             Phone: (312) 422-2501

Appellees Attorneys:         YVETTE LOIZON, PATRICK F. BRADLEY,
                             NICHOLOS T. MOTHERWAY
                             CLIFFORD LAW OFFICES, P.C.
                             120 North LaSalle Street, Suite 3600
                             Chicago, IL 60602
                             Phone: (312) 899-9090